# EXHIBIT A

# (Part 1 of 3)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| UMB Bank, National Association, AS TRUSTEE | : | Index No. |
| | : | |
| Plaintiff, | : | Date Index No. Purchased: |
| | : | February 6, 2020 |
| - against - | : | |
| | : | **SUMMONS** |
| BLUESTONE COKE, LLC f/k/a | : | |
| ERP COMPLIANT COKE, LLC, | : | |
| THOMAS MATTHEW CLARKE, | : | Basis of Venue: |
| and ANA MERCEDES CLARKE | : | CPLR § 501, 509 and by agreement |
| | : | of parties |
| Defendants. | | |

TO THE ABOVE-NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the notice of motion for summary judgment in lieu of complaint in this action and serve a copy of your answering papers on Plaintiff's attorneys no later than ten days before return date. In case of your failure to appear, judgment will be taken against you by default of the relief demanded in the motion for summary judgment in lieu of complaint.

The action will be heard in the Supreme Court of the State of New York and for New York County.

DATED:    New York, New York
              February 6, 2020

Respectfully submitted,

By: _____

Joseph P. Lombardo
Michael Friedman
CHAPMAN AND CUTLER LLP
1270 Avenue of the Americas
New York, New York 10020

Telephone: 212-655-6000
Facsimile:  212-697-7210
Email: friedman@chapman.com

*Attorneys for UMB Bank N.A., as Trustee,*
*Collateral Agent, Paying Agent, Registrar*
*and Calculation Agent*

To:
Bluestone Coke, LLC f/k/a
ERP Compliant Coke, LLC
c/o Registered Agent:
Corporation Service Company
51 Little Falls Drive
Wilmington, DE 19808

Thomas Matthew Clarke
192 Summerfield Court, Suite 203
Roanoke, VA 24019

Ana Mercedes Clarke
192 Summerfield Court, Suite 203
Roanoke, VA 24019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UMB Bank, National Association, AS TRUSTEE

                Plaintiff,

     - against -

BLUESTONE COKE, LLC f/k/a
ERP COMPLIANT COKE, LLC,
THOMAS MATTHEW CLARKE,
and ANA MERCEDES CLARKE

              Defendants.

Index No.

Date Index No. Purchased:
February 6, 2020

**<u>NOTICE OF MOTION</u>**

TO THE ABOVE-NAMED DEFENDANTS:

      PLEASE TAKE NOTICE THAT, upon the Summons dated February 6, 2020; the attached Affidavit of Gordon Gendler in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint Under CPLR § 3213, sworn to on February 6, 2020, and the exhibits attached thereto; and the accompanying Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint Under CPLR § 3213 dated February 6, 2020, the Plaintiff will move this Court at an IAS Part at the Courthouse, located at 60 Centre Street, New York, NY 10007 on March 19, 2020 at 9:30 a.m., or as soon thereafter as counsel can be heard, for an order, pursuant to CPLR § 3213, granting summary judgment in lieu of complaint, in favor of Plaintiff and against Defendants Bluestone Coke, LLC f/k/a ERP Compliant Coke, LLC, Thomas Matthew Clarke, and Ana Mercedes Clarke in the amount of $11,225,067.70, plus accrued interest and attorneys' fees, and for such other and further relief as the Court deems proper, upon the grounds that this action is based upon instruments for the payment of money only that is now due and payable, and that there is no defense to the action.

PLEASE TAKE FURTHER NOTICE THAT, pursuant to CPLR§§ 2214(b) and 3213, answering papers (and a notice of cross-motion, with supporting papers) if any, must be served upon the undersigned at least ten (10) days before the return date of this motion, and any reply papers shall be served at least one (1) day before the return date of this motion.

DATED:  New York, New York
February 6, 2020

Respectfully submitted,

By: _____

Joseph P. Lombardo
Michael Friedman
CHAPMAN AND CUTLER LLP
1270 Avenue of the Americas
New York, New York 10020
Telephone: 212-655-6000
Facsimile:  212-697-7210
Email: friedman@chapman.com

*Attorneys for UMB Bank N.A., as Trustee, Collateral Agent, Paying Agent, Registrar and Calculation Agent*

Case 1:20-cv-02043-LJL   Document 1-2   Filed 03/06/20   Page 6 of 114

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UMB Bank, national association, AS TRUSTEE  :

     Plaintiff,       :

   :

 - against -         :

   :

ERP COMPLIANT COKE, LLC,     :
THOMAS MATTHEW CLARKE,    :
and ANA MERCEDES CLARKE     :

   :

     Defendants.     :

### AFFIDAVIT OF GORDON GENDLER

1. I am Gordon Gendler, Senior Vice President for UMB Bank, National Association ("UMB"). I am a resident of the State of Minnesota and have been at all times relevant to this action.

2. I make this affidavit in support of Plaintiff UMB's, as trustee, ("Plaintiff's") Motion for Summary Judgment in Lieu of Complaint under CPLR § 3213, based on my personal knowledge. If called upon to do so, I would testify to the following facts:

3. Certain Floating Rate Senior Secured Amortizing PIK Toggle Notes due December 31, 2019 in the aggregate principal amount of $22,500,000 (the "Notes") were issued pursuant to a Floating Rate Senior Secured Amortizing PIK Toggle Notes Indenture, dated as of January 11, 2017 (the "Indenture"). Attached hereto as Exhibit A is a true and correct copy of the Indenture, which was entered into between ERP Iron Ore, LLC and predecessor trustee Wilmington Savings

FILED: NEW YORK COUNTY CLERK 02/06/2020 04:16 PM

NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 02/06/2020

Fund Society, FSB ("WSFS").  Attached as Group Exhibit B are true and correct copies of the Notes.

4.     On November 29, 2019, WSFS was removed and the Plaintiff was appointed as successor Trustee, Collateral Agent, Paying Agent, Registrar, and Calculation Agent under the Indenture and other related documents, and Plaintiff accepted such appointment.  Attached hereto as Exhibit C is a true and correct copy of the Instrument of Removal, Appointment and Acceptance naming Plaintiff as successor trustee.

5.     Concurrently with the Indenture, Thomas Clarke ("Thomas") and Ana Clarke ("Ana") executed a Guarantee Agreement (the "Guarantee Agreement").   Attached hereto as Exhibit D is a true and correct copy of the Guarantee Agreement.

6.     The Guarantee Agreement was executed pursuant to and subject to the Indenture, which also provides for a guarantee of these obligations by ERP Compliant Coke.

7.     On May 25, 2018, certain creditors filed an involuntary petition under 11 U.S.C. § 303(a) of the United States Bankruptcy Code against ERP Iron, commencing a bankruptcy case

in the District of Minnesota styled as In re ERP Iron Ore, LLC, Case No. 18-50378 (the "Bankruptcy Case"). That case is ongoing as of the date of the filing of this Complaint.

8.       On July 17, 2018, an Event of Default under the Indenture occurred pursuant to Section 6.01(a)(9)(i)(B) of the Indenture when ERP Iron consented to an order for relief in the Bankruptcy Case.

9.       On that same day, all principal and accrued and unpaid interest on the Notes was accelerated and became immediately due and payable under Section 6.02(a)(2) of the Indenture.

10.      Upon acceleration of all principal and accrued and unpaid interest on the Notes on July 17, 2018, a 180-day standstill period regarding collection from ERP Compliant Coke began running pursuant to Sections 6.02(b) and (c) of the Indenture.

11.      WSFS as trustee under the Indenture did not receive a Redemption Failure Notice within ten business days following the expiration of the standstill period, as required by the Indenture. Thus, pursuant to the terms of the Indenture as well as the passage of time, the 180-day standstill period has expired.

12.      Accordingly, the Trustee, Collateral Agent, and holders of the Notes were each then empowered to pursue any available remedy to collect payment of principal, premium, and interest on the Notes including the payment of attorneys' fees and expenses.

13.      On June 7, 2019, WSFS delivered a written demand to Defendants seeking collection of all Issuer Obligations that, at the time, totaled no less than $15,207,026.34, consisting of principal and interest and costs and expenses up to and including May 31, 2019. Attached hereto as Exhibit E is a true and correct copy of the written demand dated June 7, 2019.

14.      Since then, the amount of Issuer Obligations has continued and will continue to accrue in the form of interest (including interest at the default rate pursuant to Section 2.12(a) of

the Indenture), costs and expenses (including the reasonable attorneys' fees and expenses of the Trustee and the Holders pursuant Section 2.1(c) of the Guarantee and Section 7.07(b) of the Indenture), among other sources of Issuer Obligations.

15.     Despite demand, following the written demand, none of the Defendants have made payment under the Guarantee Agreement.

16.     On October 24, 2019, WSFS, as indenture trustee for the Notes, entered into a settlement with the Chapter 7 Trustee, Nauni Manty, appointed in the Bankruptcy Case. Pursuant to that settlement, the Chapter 7 Trustee agreed to disburse $7,075,942.33. Attached as Exhibit F is a true and correct copy of the settlement agreement.

17.     After payment of WSFS's fees and expenses to which it was entitled under the Indenture and the retention of a reserve amount in the trust estate, an amount equal to $6,069,803.31 was distributed to the holders of the Notes for payment of principal and interest due on the Notes on November 15, 2019.

18.     Accordingly, as of February 5, 2020, $10,583,861.76 in principal; plus accrued, but unpaid, interest in the amount of $264,555.38; plus unpaid fees, including attorneys' fees and costs, is outstanding on the Notes and due under the Indenture and Guarantee Agreement, which amount

of unpaid fees includes an amount equal to at least $374,650.66 attributable to attorneys fees and expenses owed to certain holders of the Notes.

Gordon Gendler

Sworn before me this 6th day of February 2020.

Notary Public

CHRISTIN ELIZABETH DAVIES
Notary Public - Minnesota
My Comm. Exp: Jan 31, 2021

Case 1:20-cv-02043-LJL   Document 1-2   Filed 03/06/20   Page 11 of 114

# EXHIBIT A

Document3

*Execution Version*

FLOATING RATE SENIOR SECURED AMORTIZING PIK TOGGLE NOTES INDENTURE

Dated as of January 30, 2017

Among

ERP Iron Ore, LLC as Issuer,

THE GUARANTORS LISTED ON THE SIGNATURE PAGES HERETO

and

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Trustee, Collateral Agent, Paying Agent, Registrar and Calculation Agent

FLOATING RATE SENIOR SECURED AMORTIZING PIK TOGGLE NOTES DUE 2019

#4834-6333-0618

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS AND INCORPORATION BY REFERENCE ..................... 1
    Section 1.01    Definitions ................................................................................... 1
    Section 1.02    Other Definitions ...................................................................... 22
    Section 1.03    Rules of Construction ............................................................... 24
    Section 1.04    [Reserved] ................................................................................ 25
    Section 1.05    Acts of Holders ........................................................................ 25

ARTICLE 2 THE NOTES ...................................................................................... 27
    Section 2.01    Form and Dating; Terms .......................................................... 27
    Section 2.02    Execution and Authentication .................................................. 28
    Section 2.03    Registrar, Paying Agent and Calculation Agent ..................... 29
    Section 2.04    Paying Agent to Hold Money in Trust ..................................... 29
    Section 2.05    Holder Lists .............................................................................. 29
    Section 2.06    Transfer and Exchange ............................................................ 30
    Section 2.07    Replacement Notes ................................................................... 31
    Section 2.08    Outstanding Notes .................................................................... 31
    Section 2.09    Treasury Notes ......................................................................... 31
    Section 2.10    Temporary Notes ..................................................................... 32
    Section 2.11    Cancellation ............................................................................. 32
    Section 2.12    Defaulted Interest .................................................................... 32
    Section 2.13    CUSIP and ISIN Numbers ...................................................... 33
    Section 2.14    Interest ...................................................................................... 33
    Section 2.15    Additional Amounts ................................................................. 34

ARTICLE 3 REDEMPTION .................................................................................. 37
    Section 3.01    Notices to Trustee. ................................................................... 37
    Section 3.02    Selection of Notes to be Redeemed or Purchased in Part ....... 37
    Section 3.03    Notice of Redemption. ............................................................. 37
    Section 3.04    Effect of Notice of Redemption. .............................................. 38
    Section 3.05    Deposit of Redemption or Purchase Price. .............................. 39
    Section 3.06    Optional Redemption. .............................................................. 39
    Section 3.07    Mandatory Redemption. .......................................................... 40
    Section 3.08    Notes Redeemed or Purchased in Part ..................................... 40

ARTICLE 4 COVENANTS .................................................................................... 40
    Section 4.01    Payment of Notes ..................................................................... 40
    Section 4.02    Prepayment of Notes ................................................................ 40
    Section 4.03    Taxes ........................................................................................ 41
    Section 4.04    Stay, Extension and Usury Laws ............................................. 41
    Section 4.05    Corporate Existence ................................................................. 41
    Section 4.06    Reports and Other Information ................................................. 41

-i-

Section 4.07    [Reserved]................................................................................ 42
Section 4.08    Limitation on Restricted Payments........................................... 42
Section 4.09    Limitation on Indebtedness....................................................... 43
Section 4.10    Limitation on Liens.................................................................... 45
Section 4.11    Future Guarantors..................................................................... 45
Section 4.12    Limitation on Restrictions on Distribution From Subsidiaries ............ 46
Section 4.13    Limitations on Investments, Loans, Advances, Guarantees and
                Acquisitions............................................................................. 47
Section 4.14    Transactions with Affiliates ..................................................... 47
Section 4.15    Repurchase Upon Event of Default .......................................... 49
Section 4.16    Issuer Notice of Default Under Progress Note ........................ 51

ARTICLE 5 SUCCESSORS................................................................................ 51
Section 5.01    Merger, Consolidation or Sale of Assets. ................................ 51

ARTICLE 6 DEFAULTS AND REMEDIES........................................................ 52
Section 6.01    Events of Default ...................................................................... 52
Section 6.02    Acceleration ............................................................................. 55
Section 6.03    Other Remedies ........................................................................ 59
Section 6.04    Waiver of Past Defaults ........................................................... 59
Section 6.05    Control by Majority .................................................................. 59
Section 6.06    Limitation on Suits.................................................................... 60
Section 6.07    Rights of Holders to Receive Payment ..................................... 60
Section 6.08    Collection Suit by Trustee ........................................................ 60
Section 6.09    Restoration of Rights and Remedies ......................................... 60
Section 6.10    Rights and Remedies Cumulative.............................................. 61
Section 6.11    Delay or Omission Not Waiver................................................. 61
Section 6.12    Trustee May File Proofs of Claim ............................................ 61
Section 6.13    Priorities ................................................................................... 62
Section 6.14    Undertaking for Costs .............................................................. 62

ARTICLE 7 TRUSTEE ....................................................................................... 63
Section 7.01    Duties of Trustee...................................................................... 63
Section 7.02    Rights of Trustee....................................................................... 64
Section 7.03    Individual Rights of Trustee ..................................................... 66
Section 7.04    Trustee's Disclaimer ................................................................ 66
Section 7.05    Notice of Defaults..................................................................... 66
Section 7.06    Reports by Trustee to Holders of the Notes............................. 67
Section 7.07    Compensation and Indemnity ................................................... 67
Section 7.08    Replacement of Trustee ............................................................ 68
Section 7.09    Successor Trustee by Merger, etc ............................................. 69
Section 7.10    Eligibility; Disqualification ...................................................... 69

ARTICLE 8 [RESERVED] ................................................................................. 69

#4834-6333-0618

ARTICLE 9 AMENDMENT, SUPPLEMENT AND WAIVER ................................................ 69
    Section 9.01    Without Consent of Holders ................................................ 69
    Section 9.02    With Consent of Holders ................................................ 71
    Section 9.03    Compliance with Trust Indenture Act ................................................ 73
    Section 9.04    Revocation and Effect of Consents ................................................ 73
    Section 9.05    Notation on or Exchange of Notes ................................................ 73
    Section 9.06    Trustee to Sign Amendments, etc ................................................ 73
    Section 9.07    Payment for Consent ................................................ 74

ARTICLE 10 COLLATERAL AND SECURITY ................................................ 74
    Section 10.01    The Collateral ................................................ 74
    Section 10.02    Further Assurances ................................................ 75
    Section 10.03    After-Acquired Property. ................................................ 75
    Section 10.04    Impairment of Security Interest ................................................ 76
    Section 10.05    Real Estate Mortgages and Filings ................................................ 77
    Section 10.06    Release of Collateral ................................................ 77
    Section 10.07    Authorization of Actions to be Taken by the Trustee or the Collateral Agent Under the Collateral Documents ................................................ 78
    Section 10.08    Collateral Account ................................................ 79
    Section 10.09    Information Regarding Collateral ................................................ 80
    Section 10.10    Maintenance of Collateral ................................................ 80
    Section 10.11    Negative Pledge ................................................ 81

ARTICLE 11 GUARANTEES ................................................ 81
    Section 11.01    Guarantee ................................................ 81
    Section 11.02    Limitation on Guarantor Liability ................................................ 83
    Section 11.03    Execution and Delivery ................................................ 83
    Section 11.04    Subrogation ................................................ 84
    Section 11.05    Benefits Acknowledged ................................................ 84
    Section 11.06    Release of Note Guarantees ................................................ 84

ARTICLE 12 SATISFACTION AND DISCHARGE ................................................ 85
    Section 12.01    Satisfaction and Discharge ................................................ 85
    Section 12.02    Application of Trust Money ................................................ 86

ARTICLE 13 MISCELLANEOUS ................................................ 86
    Section 13.01    Notices ................................................ 86
    Section 13.02    Certificate and Opinion as to Conditions Precedent ................................................ 88
    Section 13.03    Statements Required in Certificate or Opinion ................................................ 88
    Section 13.04    Rules by Trustee and Agents ................................................ 89
    Section 13.05    No Personal Liability of Directors, Officers, Employees, Members, Partners and Stockholders ................................................ 89
    Section 13.06    Governing Law ................................................ 89
    Section 13.07    Waiver of Jury Trial ................................................ 89
    Section 13.08    Force Majeure ................................................ 89

#4834-6333-0618

Section 13.09    No Adverse Interpretation of Other Agreements...................................89
Section 13.10    Successors ....................................................................................90
Section 13.11    Severability ..................................................................................90
Section 13.12    Counterpart Originals.....................................................................90
Section 13.13    Table of Contents, Headings, etc .....................................................90
Section 13.14    Facsimile and PDF Delivery of Signature Pages...................................90
Section 13.15    U.S.A. PATRIOT Act......................................................................90
Section 13.16    Payments Due on Non-Business Days.................................................90
Section 13.17    Effectiveness of Indenture ..............................................................91
Section 13.18    Trustee as Agent ...........................................................................91

#4834-6333-0618

Schedule A    Existing Indebtedness

Schedule 6.02 Mechanics Lienholders

Appendix A    Provisions Relating to Notes

Exhibit A     Form of Note
Exhibit B     Form of Institutional Accredited Investor Transferee Letter of Representation
Exhibit C     Form of Supplemental Indenture to Be Delivered by Subsequent Guarantors
Exhibit D     Form of Issuer Notification of PIK Interest Election
Exhibit E     Form of Issuer Notification and Direction to Trustee Under Section 2.14(d) of the
              Indenture Regarding the Payment of PIK Interest

#4834-6333-0618

INDENTURE, dated as of January 30, 2017, among ERP Iron Ore LLC, a Virginia limited liability company (the "Issuer"), the Guarantors listed on the signature pages hereto and Wilmington Savings Fund Society, FSB, as trustee (the "Trustee"), collateral agent (in such capacity, the "Collateral Agent"), paying agent (in such capacity, the "Paying Agent"), registrar (in such capacity, the "Registrar") and calculation agent (in such capacity, the "Calculation Agent").

W I T N E S S E T H

WHEREAS, on May 5, 2015, Magnetation LLC and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), and the Debtor Company and the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, by order, dated December 21, 2016 (the "Sale Order"), the Bankruptcy Court approved Initial Buyer's (as defined in the APA) purchase of substantially all of the Debtors' assets free and clear of Liens, claims, encumbrances and interests;

WHEREAS, pursuant to the Sale Order, Initial Buyer designated the Issuer as the purchaser in exchange for the ERP Assumption (as defined in the APA);

WHEREAS, in accordance with the ERP Assumption, the Issuer has duly authorized the creation and issuance at Closing (as defined in the APA) of $22,500,000 aggregate principal amount of Floating Rate Senior Secured Amortizing PIK Toggle Notes due December 31, 2019 (*provided* that the principal amount of the Notes authorized and outstanding may be increased in connection with PIK Interest) (the "Notes"); and

WHEREAS, the Issuer and each of the Guarantors have duly authorized the execution and delivery of this Indenture;

NOW, THEREFORE, the Issuer, the Guarantors, the Trustee and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders of the Notes.

ARTICLE 1

DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01   Definitions.

"Acquired Indebtedness" means, with respect to any specified Person, (1) Indebtedness of any Person or any of its Subsidiaries existing at the time such Person becomes a Subsidiary, (2) Indebtedness assumed in connection with the acquisition of assets from such Person, or (3) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person, in each case whether or not Incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Subsidiary or such acquisition.

#4834-6333-0618

Acquired Indebtedness shall be deemed to have been Incurred, with respect to clause (1) of the preceding sentence, on the date such Person becomes a Subsidiary and, with respect to clauses (2) and (3) of the preceding sentence, on the date of consummation of such acquisition of assets.

"AKS" means AK Steel Holding Corporation, a Delaware corporation.

"Affiliate" of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") when used with respect to any Person means possession, directly or indirectly, of the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing, *provided* that exclusively for purposes of Section 4.14, beneficial ownership of 10% or more of the Voting Stock of a Person shall be deemed to be control.

"Agent" means any Collateral Agent, Paying Agent, Registrar or Calculation Agent.

"Amortization Amount" means $2,000,000 or such lesser amount as is due on any Amortization Payment Date.

"Amortization Payment Date" means each of March 31, June 30, September 30 and December 31, of each fiscal year beginning on, and inclusive of, June 30, 2017.

"APA" means that certain asset purchase agreement, dated as of December 6, 2016, by and among MG Initial Purchaser, LLC, a Delaware limited liability company, the Issuer, the Debtor Company and certain of its Subsidiaries.

"Average Life" means, as of the date of determination, with respect to any Indebtedness or Preferred Stock, the quotient obtained by dividing (1) the sum of the products obtained by multiplying (a) the amount of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Preferred Stock by (b) the number of years (calculated to the nearest one-twelfth) from the date of determination to the date of such payment; by (2) the sum of the amounts of all such payments.

"Bankruptcy Code" means Title 11 of the United States Code or any applicable successor statute.

"Bankruptcy Law" means the Bankruptcy Code, as amended, or any similar federal, state or foreign law for the relief of debtors.

"beneficial ownership" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, and "beneficial owner" has a corresponding meaning.

"Board of Directors" means:

(1)    with respect to the Issuer, the board of managers of the Issuer, or in

#4834-6333-0618

the event the Issuer has no board of managers, the board of directors or managers of the Issuer's managing member;

      (2)    with respect to a corporation, the board of directors of the corporation;

      (3)    with respect to a partnership, the board of directors of the general partner of the partnership; and

      (4)    with respect to any other Person, the board or committee of such Person serving a similar function;

and, in each case, other than for purposes of determining a Change of Control, any duly authorized committee of any such body.

"Business Day" means each day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York are authorized or required by law to close.

"Calculation Agent" means a financial institution appointed by the Issuer to calculate the interest rate payable on the Notes in respect of each Interest Period, which shall initially be the Trustee.

"Calculation Date" means, with respect to any Interest Determination Date, the earlier of (i) the tenth calendar day after such Interest Determination Date, or, if any such day is not a Business Day, the next succeeding Business Day, and (ii) the Business Day immediately preceding the applicable Interest Payment Date or the maturity date, as the case may be.

"Capital Stock" of any Person means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock and limited liability or partnership interests (whether general or limited), but excluding any debt securities convertible or exchangeable into such equity.

"Capitalized Lease Obligations" means an obligation that is required to be classified and accounted for as a capitalized lease for financial reporting purposes in accordance with GAAP. The amount of Indebtedness represented by such obligation will be the capitalized amount of such obligation at the time any determination thereof is to be made as determined in accordance with GAAP, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

"Cash Equivalents" means:

      (1)    U.S. dollars or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

      (2)    securities issued or directly and fully Guaranteed or insured by the U.S. government or any agency or instrumentality of the United States (*provided that the*

#4834-6333-0618

full faith and credit of the United States is pledged in support thereof), having maturities of not more than one year from the date of acquisition;

(3)     marketable general obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition and, at the time of acquisition, having a credit rating of at least "A" or the equivalent thereof by S&P or Moody's or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of investments;

(4)     certificates of deposit, time deposits, eurodollar time deposits, overnight bank deposits or bankers' acceptances having maturities of not more than one year from the date of acquisition thereof issued by any commercial bank the long-term debt of which is rated at the time of acquisition thereof at least "A" or the equivalent thereof by S&P or Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of investments, and having combined capital and surplus in excess of $500.0 million;

(5)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (2), (3) and (4) entered into with any bank meeting the qualifications specified in clause (4) above;

(6)     commercial paper rated at the time of acquisition thereof at least "A-2" or the equivalent thereof by S&P or "P-2" or the equivalent thereof by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of investments, and in any case maturing within one year after the date of acquisition thereof; and

(7)     interests in any investment company or money market fund which invests 95% or more of its assets in instruments of the type specified in clauses (1) through (6) above.

"Cash Interest" means the payment of interest on the Notes in cash equal to the amount of accrued and unpaid interest due on the relevant Interest Payment Date.

"Change of Control" means:

(1)     any person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the date of the original issuance of the Notes hereunder, but excluding any employee benefit plan of such person and its subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) shall have acquired beneficial ownership (within the meaning of Rules 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date) of Equity Interests of the Issuer representing more than 50% of the voting interests represented by the issued and outstanding Equity Interests of the Issuer (determined on a fully diluted basis but not giving effect to contingent voting rights that have not yet vested); or

-4-

#4834-6333-0618

(2)     the merger or consolidation of the Issuer with or into another
Person or the merger of another Person with or into the Issuer or the merger of any
Person with or into a Subsidiary of the Issuer, unless the holders of a majority of the
aggregate voting power of the Voting Stock of the Issuer, immediately prior to such
transaction, hold securities of the surviving or transferee Person that represent,
immediately after such transaction, at least a majority of the aggregate voting power of
the Voting Stock of the surviving or transferee Person; or

(3)     the sale, assignment, conveyance, transfer, lease or other
disposition (other than by way of merger or consolidation), in one or a series of
transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries taken
as a whole to any "person" (as such term is used in Sections 13(d) and 14(d) of the
Exchange Act); or

(4)     the adoption by the stockholders of the Issuer or any parent entity
of a plan or proposal for the liquidation or dissolution of the Issuer or any parent entity.

"Clarke Guarantors" means each of Thomas Matthew Clarke and Ana Mercedes
Clarke, each, an individual, and each with an address for mailing c/o ERP Compliant Fuels, LLC
at 15 Appledore Lane, Natural Bridge, Virginia  24578, each, an owner of direct and indirect
Equity Interests of the Issuer and certain of its affiliates.

"Code" means the Internal Revenue Code of 1986, as amended.

"COKE" means ERP Compliant COKE, LLC, a Delaware limited liability
company, and its successors.

"Coke Collateral" means all assets of the Coke Guarantor subject to Liens created
pursuant to Collateral Documents and subject to Liens securing the Coke Guarantor's
Obligations.

"Coke Guarantor" means COKE and any of its Subsidiaries or parents which may
at any time Guarantee the Notes and the Issuer's Obligations under each other Notes Document.

"Coke Plant" means (i) the 244-acre parcel of real property located in
Birmingham, Alabama on which coke manufacturing facilities, including coke ovens, railyard
and water treatment assets, are operated by COKE to produce, among other things, blast furnace
coke, foundry coke, and industrial coke, and (ii) all fixtures located on such real property.

"Collateral" means all property and assets whether now owned or hereafter
acquired, in which Liens are, from time to time, purported to be granted to secure the Notes, the
Note Guarantees and the Issuer's Obligations under each other Notes Document pursuant to the
Collateral Documents.

"Collateral Account" means one or more segregated accounts pledged under the
Collateral Documents that is under the control of the Collateral Agent and is free from all other
Liens, and includes cash and Cash Equivalents received by the Trustee or the Collateral Agent
from Recovery Events, foreclosures on or sales of Collateral or any other awards or proceeds

pursuant to the Collateral Documents, including earnings, revenues, rents, issues, profits and income from the Collateral received pursuant to the Collateral Documents and interest earned thereon.

"Collateral Documents" means the Mortgages, the Subordination Agreement, deeds of trust, deeds to secure debt, security agreements, pledge agreements, hypothecs, collateral agency agreements, collateral assignments, debentures, control agreements and other instruments and documents executed and delivered pursuant to the Indenture or any of the foregoing (including, without limitation, the financing statements under the Uniform Commercial Code of the relevant state) that create or purport to create a Lien in the Collateral in favor of the Collateral Agent and/or the Trustee (for the benefit of the Holders of Notes and the Trustee in its various capacities) or any notice of such pledge, assignment or grant, in each case as they may be amended, supplemented or otherwise modified from time to time.

"Commodity Agreement" means, with respect to any Person, any commodity future or forward, swap or option, cap or collar or other similar agreement or arrangement as to which such Person is a party or beneficiary.

"Common Stock" means with respect to any Person, any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or nonvoting) of such Person's common equity whether or not outstanding on the Issue Date, and includes, without limitation, all series and classes of such common equity.

"Corporate Trust Office of the Trustee" shall be at the address of the Trustee specified in Section 13.01 or such other address as to which the Trustee may give notice to the Holders and the Issuer.

"Currency Agreement" means, with respect to any Person, any foreign exchange future or forward, swap or option, cap or collar or other similar agreement or arrangement as to which such Person is a party or a beneficiary.

"Custodian" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"Debtor Company" means Magnetation LLC, a Delaware limited liability company.

"Default" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"Definitive Note" means a certificated Note (bearing the Restricted Notes Legend if the transfer of such Note is restricted by applicable law) that does not include the Global Notes Legend.

"Depositary" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 as the Depositary with respect to the Notes, and any and all successors thereto appointed as Depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

#4834-6333-0618

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event:

(1) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise;

(2) is convertible into or exchangeable for Indebtedness or Capital Stock that satisfies the requirements of clause (1) or (3) hereof (excluding Capital Stock which is convertible or exchangeable solely at the option of the Issuer or a Subsidiary (it being understood that upon such conversion or exchange it shall be an Incurrence of such Indebtedness or Disqualified Stock)); or

(3) is redeemable at the option of the holder of the Capital Stock in whole or in part,

in each case on or prior to the date 91 days after the earlier of the final maturity date of the Notes or the date the Notes are no longer outstanding; *provided, however*, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock.

"DTC" means The Depository Trust Company or any successor thereto.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Fair Market Value" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by Senior Management of the Issuer in good faith; *provided* that, except as otherwise provided in this Indenture, if the fair market value exceeds $2.0 million, such determination shall be made by the Board of Directors of the Issuer or an authorized committee thereof in good faith (including as to the value of all non-cash assets and liabilities).

"FerroMagnetica" means FerroMagnetica, LLC, a Delaware limited liability company and its successors.

"Foreign Subsidiary" means any Subsidiary that is not organized under the laws of the United States or any state thereof or the District of Columbia.

"GAAP" means generally accepted accounting principles in the United States as in effect as of the Issue Date, including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and

#4834-6333-0618

statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession. Unless otherwise specified, all ratios and computations contained in this Indenture shall be computed in conformity with GAAP, except that in the event the Issuer is acquired in a transaction that is accounted for using purchase accounting, the effects of the application of purchase accounting shall be disregarded in the calculation of such ratios and other computations contained in this Indenture.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Government Securities" means securities that are (1) direct obligations of the United States for the timely payment of which its full faith and credit is pledged or (2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States the timely payment of which is unconditionally Guaranteed as a full faith and credit obligation of the United States, which, in either case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depositary receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depositary receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depositary receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depositary receipt.

"Guarantee" means (1) any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and (2) any obligation, direct or indirect, contingent or otherwise, of such Person:

      (a)    to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise); or

      (b)    entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided, however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantor" means each of the signatories hereto other than the Issuer and the Trustee as well as any Person that may in the future provide a Note Guarantee or that provides a Note Guarantee on the Issue Date pursuant to this Indenture or otherwise. For purposes of Articles 10 and 11 of this Indenture, the term "Guarantor" will be deemed not to include either of

#4834-6333-0618

Thomas Matthew Clarke or Ana Mercedes Clarke.

"Hedging Obligations" of any Person means the obligations of such Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Agreement.

"Holder" means a Person in whose name a Note is registered on the Registrar's books.

"Incur" means issue, create, assume, Guarantee, incur or otherwise become liable for; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Subsidiary at the time it becomes a Subsidiary; and the terms "Incurred" and "Incurrence" have meanings correlative to the foregoing.

"Indebtedness" of any Person means, without duplication:

(1) the principal of and premium (if any) in respect of indebtedness of such Person for borrowed money;

(2) the principal of and premium (if any) in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3) the principal component of all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments (including reimbursement obligations with respect thereto except to the extent such reimbursement obligation relates to a trade payable and such obligation is satisfied within 30 days of Incurrence);

(4) the principal component of all obligations of such Person to pay the deferred and unpaid purchase price of property (including earn-out obligations), which purchase price is due after the date of placing such property in service or taking delivery and title thereto, except (a) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (b) any earn-out obligation until the amount of such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP;

(5) Capitalized Lease Obligations of such Person (whether or not such items would appear on the balance sheet of such Person in accordance with GAAP);

(6) the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the principal component or liquidation preference of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock;

(7) the principal component of all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person;

#4834-6333-0618

(8)     the principal component of Indebtedness of other Persons to the extent Guaranteed by such Person (whether or not such items would appear on the balance sheet of such Person in accordance with GAAP);

(9)     to the extent not otherwise included in this definition, net obligations of such Person under Hedging Obligations (the amount of any such obligations to be equal at any time to the termination value of such agreement or arrangement giving rise to such Obligation that would be payable by such Person at such time); and

(10)     to the extent not otherwise included in this definition, the amount of obligations outstanding under the legal documents entered into as part of a securitization transaction or series of securitization transactions that would be characterized as principal if such transaction were structured as a secured lending transaction rather than as a purchase relating to a securitization transaction or series of securitization transactions.

Notwithstanding the foregoing, the amount of any Indebtedness outstanding as of any date shall (i) be the accreted value thereof in the case of any Indebtedness issued with original issue discount or the aggregate principal amount outstanding in the case of Indebtedness issued with interest payable in kind and (ii) include any interest (or in the case of Preferred Stock, dividends) thereon that is more than 30 days past due. Except to the extent provided in the preceding sentence, the amount of any Indebtedness that is convertible into or exchangeable for Capital Stock of the Issuer outstanding as of any date shall be deemed to be equal to the principal and premium, if any, in respect of such Indebtedness, notwithstanding the provisions of GAAP (including Accounting Standards Codification Topic 470-20, Debt-Debt with Conversion and Other Options).

In addition, "Indebtedness" of any Person shall include Indebtedness described in the preceding paragraph that would not appear as a liability on the balance sheet of such Person if:

(1)     such Indebtedness is the obligation of a partnership or joint venture that is not a Subsidiary;

(2)     such Person or a Subsidiary of such Person is a general partner of the partnership or joint venture as contemplated in subclause (1) above; and

(3)     there is recourse, by contract or operation of law, with respect to the payment of such Indebtedness to property or assets of such Person or a Subsidiary of such Person; and then such Indebtedness shall be included in an amount not to exceed:

(a)     the lesser of (i) the net assets of a general partner as contemplated in subclause (2) above and (ii) the amount of such obligations to the extent that there is recourse, by contract or operation of law, to the property or assets of such Person or a Subsidiary of such Person; or

(b)     if less than the amount determined pursuant to clause (a) immediately above, the actual amount of such Indebtedness that is recourse to such Person or a Subsidiary of such Person, if the Indebtedness is evidenced by a

-10-

NYSCEF DOC. NO. 4

RECEIVED NYSCEF: 02/06/2020

writing and is for a determinable amount.

Indebtedness shall not include any obligations relating to any factoring or other accounts receivable or iron ore concentrate or pellet inventory sales arrangements the cash proceeds of which are encumbered by the security interest in Collateral granted to the Holders in the Security Agreement, provided that any discount to the face amount of an invoice sold shall not exceed 5.0%.

"Indenture" means this Indenture, as amended or supplemented from time to time.

"Independent Financial Advisor" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of the Issuer, qualified to perform the task for which it has been engaged.

"Initial Interest Period" means the date of the original issuance of the Notes hereunder through March 30, 2017.

"Interest Determination Date" for an Interest Period shall be the second Business Day preceding the first day of such Interest Period (or, in the case of the Initial Interest Period, the second Business Day preceding the date of the original issuance of Notes hereunder).

"Interest Payment Date" means each of March 31, June 30, September 30 and December 31 of each fiscal year beginning on, and inclusive of, March 31, 2017.

"Interest Period" means the period commencing on an Interest Payment Date (or, in the case of the Initial Interest Period, commencing on the date of the original issuance of the Notes hereunder) and ending on the day preceding the next following Interest Payment Date or the redemption date, as applicable.

"Interest Rate Agreement" means, with respect to any Person, any interest rate future or forward, swap or option, cap or collar or other similar agreement or arrangement as to which such Person is party or a beneficiary.

"Investment" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of any direct or indirect advance, loan (other than advances or extensions of credit to customers in the ordinary course of business) or other extensions of credit (including by way of Guarantee or similar arrangement, but excluding any debt or extension of credit represented by a bank deposit (other than a time deposit)) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such Person and all other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP; *provided* that an acquisition of assets, Capital Stock or other securities by the Issuer or a Subsidiary for consideration to the extent such consideration consists of Common Stock of the Issuer shall not be deemed to be an Investment.

#4834-6333-0618

"Issue Date" means the date of the issuance of any Notes hereunder, including any Interest Payment Date on which additional Notes in respect of PIK Interest are to be issued.

"Issuer" means the party named as such in the first paragraph of this Indenture or any successor obligor to its Obligations under this Indenture, the Notes or the Security Agreement.

"Itasca County Properties Plant #4" means operational facilities in Coleraine, Minnesota for the production of iron ore concentrate, capable of producing at least 1.6 million tonnes annually when operating at maximum capacity.

"KYC" means the obtaining and verifying of such information as has been requested by each of the Holders and the Trustee (and has been determined by each of such to be reasonably required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act) prior to the proposed closing of any event purporting to be a Permitted Change of Control, to the satisfaction of each such Holder and the Trustee, with respect to the Person or Persons participating in an event that is purported to be a Permitted Change of Control, which information includes the name and address of each participating Person and other information that will allow each such Holder and the Trustee to identify each such Person in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective for the Trustee and each Holder of Notes hereunder.

"Leased Real Property" shall have a meaning correlative to Real Estate Leases.

"Lien" means, (i) with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, assignment priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease or license in the nature thereof or sale/leaseback, any option, trust, or other preferential arrangement or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction, or having the practical effect of any of the foregoing; *provided* that in no event shall an operating lease be deemed to constitute a Lien; and (ii) in the case of Equity Interests, any purchase option, call or similar right of a third party with respect to such Equity Interests.

"LIBOR" means, with respect to any Interest Determination Date, the London interbank offered rate as administered by ICE Benchmark Administration Limited (or any other Person that takes over the administration of such rate) for deposits in immediately available funds in United States dollars having a maturity of three months as displayed on the Bloomberg screen page that displays such rate, or on the appropriate page or screen of such other comparable information service that publishes such rate from time to time as selected by the Calculation Agent in its discretion (and in consultation with the Issuer) on that Interest Determination Date. If no rate appears, in respect of that Interest Determination Date, the Calculation Agent shall request the principal London offices of each of four major reference banks in the London interbank market, as selected by the Calculation Agent, to provide the

Calculation Agent with its offered quotation for deposits in United States dollars for the period of three months, commencing on the second London Business Day following such Interest Determination Date, to prime banks in the London interbank market at approximately 11:00 a.m., London time, on that Interest Determination Date and in a principal amount that is representative for a single transaction in United States dollars in that market at that time. If at least two quotations are provided, then LIBOR on that Interest Determination Date shall be the arithmetic mean of those quotations. If fewer than two quotations are provided, then LIBOR on the Interest Determination Date shall be the arithmetic mean of the rates quoted at approximately 11:00 a.m., in the City of New York, on the Interest Determination Date by three major banks in the City of New York selected by the Calculation Agent for loans in United States dollars to leading European banks, having a three-month maturity and in a principal amount that is representative for a single transaction in United States dollars in that market at that time; *provided, however*, that if the banks selected by the Calculation Agent are not providing quotations in the manner described by this sentence, LIBOR shall be the same as the rate determined for the immediately preceding Interest Period. LIBOR will in no event be less than 0.00% per annum.

"London Business Day" means each day that is not a Saturday, Sunday or other day on which banking institutions in London are authorized or required by law to close.

"Mechanics Lien Royalty Agreements" means that certain Settlement Agreement and Release made as of January 27, 2017, by and among the Issuer, the Debtors, Lighthouse Management Group, Inc., as administrative agent, and the mechanic's and/or miner's lien claimant signatories to that agreement as reflected in the signature blocks thereto, and the promissory note and security agreement of even date therewith entered into by the Issuer and Lighthouse Management Group, Inc., as administrative agent, holder and secured party, as applicable.

"Mechanics Lienholders" means, any Person, whether now or hereafter, entitled to payment pursuant to the ML Note.

"ML Note" means the 3% note issued to the Mechanics Lienholders by the Issuer on or about the date of the original issuance of the Notes hereunder.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgages" means the mortgages, debentures, hypothecs, deeds of trust, deeds to secure Indebtedness or other similar documents securing Liens on the Premises, as well as the other Collateral, if any, secured by and described in the mortgages, debentures, hypothecs, deeds of trust, deeds to secure Indebtedness, mortgages made by the Issuer or any other Guarantor in favor or for the benefit of the Trustee or the Collateral Agent, or other similar documents, in form and substance reasonably satisfactory to the Trustee or the Collateral Agent, as the case may be.

"Net Award" means any awards or proceeds in respect of any condemnation, seizure, taking or other eminent domain proceeding relating to any Collateral.

#4834-6333-0618

"Net Insurance Proceeds" means any awards or proceeds in respect of any casualty insurance or title insurance claim relating to any Collateral.

"Note Guarantee" means, individually, any Guarantee of payment of the Notes and the Issuer's other Obligations under each other Notes Document by a Guarantor pursuant to the terms of this Indenture and any supplemental indenture thereto or any supplemental guarantee agreement and, collectively, all such Guarantees.

"Notes" means the Notes and more particularly means any Note authenticated and delivered under this Indenture. For all purposes of this Indenture, the term "Notes" shall also include any Notes to be issued or authenticated upon registration of transfer, replacement or exchange of Notes and any Notes to be issued in connection with a PIK Payment.

"Notes Document" means any of this Indenture, the Notes, the Note Guarantees, the Security Agreement and the Collateral Documents, and any related documents thereto, as amended or supplemented from time to time.

"Obligations" means any principal (including the Amortization Amounts to be paid on each Amortization Payment Date), interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law and any Additional Amounts), other monetary obligations, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and banker's acceptances), damages and other liabilities, and Guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"Obligor" means the Issuer and any Guarantor other than Thomas Matthew Clarke and Ana Mercedes Clarke.

"Officer" of any Person means the Chairman of the Board, the Chief Executive Officer, the President, the Chief Financial Officer, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of such Person or, in the event that such Person is a partnership or a limited liability company that has no such officers, a person duly authorized under applicable law by the general partner, managers, members or a similar body to act on behalf of such Person.

"Officers' Certificate" means a certificate signed by two Officers of the Person delivering such Officers' Certificate, one of whom is the principal executive officer, the principal financial officer or the principal accounting officer.

"Opinion of Counsel" means a written opinion from legal counsel. The counsel may be an employee of or counsel to the Issuer.

"Partial PIK Interest" means the payment of interest on the Notes through an increase in the principal amount of the outstanding Notes equal to some portion (but not all) of the amount of accrued and unpaid interest due on the relevant Interest Payment Date, to the

-14-

#4834-6333-0618

extent that only a portion of the interest due on an Interest Payment Date is so paid.

"Payment Date" means any Interest Payment Date or Amortization Payment Date, as applicable.

"Permitted Change of Control" means a Change of Control involving one or more investments in the Issuer by PNR and one or more Affiliates of PNR, or FerroMagnetica, subject in the case of FerroMagnetica to satisfactory completion of KYC of the FerroMagnetica Person making such investments.

"Permitted Investment" means:

(1)     an Investment in an Obligor or a Subsidiary of such Obligor;

(2)     any Investment in direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one year from the date of acquisition thereof;

(3)     any Investment by an Obligor or any of their Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a)     such Person becomes a Guarantor; or

(b)     such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Issuer or a Guarantor,

and, in each case, any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer and does not materially and adversely affect the ability of the Issuer to make scheduled payments of interest and principal under the Notes;

(4)     any Investment in cash and Cash Equivalents;

(5)     Investments in existence on the Issue Date;

(6)     Guarantees issued in accordance with Section 4.09;

(7)     any Investment acquired by an Obligor or any of their Subsidiaries:

(a)     in exchange for any other Investment or accounts receivable held by such Obligor or any such Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

-15-

(b)    as a result of a foreclosure by such Obligor or any of its Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default; and

(8)    Investments made as a result of the receipt of non-cash consideration from an asset sale that was made pursuant to and in compliance with Section 5.01.

"Permitted Liens" means, with respect to any Person:

(1)    Liens imposed by law, including carriers', warehousemen's, mechanics', materialmen's and repairmen's Liens, Incurred in the ordinary course of business;

(2)    pledges or deposits by such Person under workers' compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import or customs duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(3)    Liens for taxes, assessments or other governmental charges not yet subject to penalties for non-payment or that are being contested in good faith by appropriate proceedings provided appropriate reserves required pursuant to GAAP have been made in respect thereof;

(4)    encumbrances, ground leases, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning, building codes or other restrictions (including, without limitation, minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(5)    leases, licenses, subleases and sublicenses of assets (including, without limitation, real property and intellectual property rights) that do not materially interfere with the ordinary conduct of the business of any Obligor or any of their Subsidiaries;

(6)    judgment Liens not giving rise to an Event of Default so long as such Lien is adequately bonded and any appropriate legal proceedings which may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(7)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depositary institution; *provided* that:

-16-

FILED: NEW YORK COUNTY CLERK 02/06/2020 Case 1:20-mc-02041-LAK Document 2-2 Filed 02/06/20 Page 34 of 114 INDEX NO. 650854/2020

NYSCEF DOC. NO. 4                                                                                    RECEIVED NYSCEF: 02/06/2020

(a)     such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the applicable Obligor in excess of those set forth by regulations promulgated by the Federal Reserve Board; and

(b)     such deposit account is not intended by the applicable Obligor or any Subsidiary of such Obligor to provide collateral for Indebtedness to the depository institution;

(8)     Liens existing on the Issue Date (other than Liens permitted under clause (10));

(9)     Liens securing Indebtedness or other obligations of a Subsidiary of an Obligor owing to such Obligor or another Subsidiary of such Obligor;

(10)     Liens securing the Notes and the Note Guarantees issued on the Issue Date and any obligations owing to the Trustee or any other Agent under this Indenture or any other Notes Document;

(11)     Liens securing Refinancing Indebtedness Incurred to refinance, refund, replace, amend, extend or modify, as a whole or in part, Indebtedness that was previously so secured pursuant to clauses (8), (10) and this clause (11) of this definition; provided that (i) any such Lien is limited to all or part of the same property or assets (plus improvements, accessions, proceeds or dividends or distributions in respect thereof) that secured (or, under the written arrangements under which the original Lien arose, could secure) the Indebtedness being refinanced or is in respect of property that is the security for a Permitted Lien hereunder and (ii) the new Lien has no greater priority relative to the Notes and to Note Guarantees, and the holders of such Indebtedness secured by such Liens have no greater rights relative to the Notes and the Note Guarantees, than the original Liens and related Indebtedness and the holders thereof;

(12)     Liens in favor of an Obligor or any Subsidiary of any Obligor;

(13)     Liens under industrial revenue, municipal or similar bonds;

(14)     Liens on the Collateral securing any Indebtedness Incurred under Section 4.09(b)(3); for the avoidance of doubt, Liens permitted under this clause (14) may be senior in priority to the Liens on the Collateral securing the Notes;

(15)     Liens on property or Capital Stock of a Person at the time such Person becomes a Subsidiary of an Obligor; provided, however, that such Liens are not created, Incurred or assumed in connection with, or in contemplation of, such other Person becoming a Subsidiary of such Obligor; provided, further, however, that any such Lien may not extend to any other property owned by the applicable Obligor or any Subsidiary of such Obligor and as do not materially impair their use in the operation of the business of such Person; provided, further, that such Liens not materially and adversely affect the ability of such Obligor to make scheduled payments of interest and principal under the Notes;

-17-

(16)   Liens on property at the time an Obligor or a Subsidiary of an Obligor acquired the property, including any acquisition by means of a merger or consolidation with or into such Obligor or any Subsidiary of such Obligor; *provided, however*, that such Liens are not created, Incurred or assumed in connection with, or in contemplation of, such acquisition; *provided, further, however*, that such Liens may not extend to any other property owned by such Obligor or any Subsidiary of such Obligor and as do not materially impair their use in the operation of the business of such Person; *provided, further*, that such Liens not materially and adversely affect the ability of such Obligor to make scheduled payments of interest and principal under the Notes;

(17)   Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods and as do not materially impair their use in the operation of the business of such Person; *provided, further, however*, that such Liens may not extend to any other property owned by such Obligor or any Subsidiary of such Obligor and as do not materially impair their use in the operation of the business of such Person; *provided, further*, that such Liens not materially and adversely affect the ability of such Obligor to make scheduled payments of interest and principal under the Notes;

(18)   mortgage Liens and security interests granted in all real and personal property to mechanic's/miner's lien claimants identified as of the date of the original issuance of the Notes hereunder, which mortgage Liens and security interests will be junior in payment priority to the Liens granted to the Collateral Agent under the Collateral Documents;

(19)   Liens to be granted to AKS in connection with the Issuer's purchase of materials and supplies from AKS pursuant to the Global Settlement Agreement (as defined in the APA);

(20)   Liens on the Coke Guarantor's assets other than the Coke Plant securing any Indebtedness Incurred under Section 4.09(b)(12); for the avoidance of doubt no Liens shall be placed on the Coke Plant pursuant to this provision;

(21)   Subordinated Liens in favor of the State of Minnesota and/or its agencies on all real and personal property of the Issuer Incurred on or after July 1, 2017 in connection with the failure by the Issuer to pay Royalties and Other Costs when due, securing the obligation of the Issuer to pay Royalties and Other Costs to the State of Minnesota and/or its agencies, which are subordinated to the Liens on the Collateral in favor of the Collateral Agent for the benefit of the Holders and the other secured parties under the Notes Documents; and

(22)   Liens claimed by  mechanic's/miner's lien claimants in the assets known as the Itasca County Properties Plant #4 in pleadings filed in a civil action pending in Itasca County District Court (Court File No. #31-CV-15-3288), such liens having the lien and payment priorities decided in the final resolution of such action.

#4834-6333-0618

"Person" means any natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governmental authorities.

"PIK Interest" means the payment of interest (including Additional Amounts, if any) on the Notes through an increase in the principal amount of the outstanding Notes equal to the amount of accrued and unpaid interest due on the relevant Interest Payment Date.

"PNR" means Pocahontas Natural Resources, LLC, a Minnesota limited liability company, the majority owner of the Issuer.

"Premises" means the owned real property (including all real property) that is required to be subject to Mortgages and forms a portion of the Collateral.

"Preferred Stock," as applied to the Capital Stock of any corporation, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends, or as to the distributions of assets upon any voluntary or involuntary liquidation or dissolution of such corporation, over shares of Capital Stock of any other class of such corporation.

"Progress" means Progress Rail Leasing Corporation, a Delaware corporation.

"Progress Lease" means that certain master railcar lease agreement, dated on or about the date hereof, between the Issuer and Progress, as amended, modified or restated from time to time.

"Progress Note" means that certain promissory note, executed by the Issuer on or about the date hereof, in favor of Progress.

"Real Estate Leases" means any existing or hereafter acquired leasehold interests in real property, or licenses or other agreements with regard to accessing real property or accessing or removing iron ore or iron ore tailings.

"Receivable" means a right to receive payment arising from a sale or lease of goods or the performance of services by a Person pursuant to an arrangement with another Person pursuant to which such other Person is obligated to pay for goods or services under terms that permit the purchase of such goods and services on credit and shall include, in any event, any items of property that would be classified as an "account," "chattel paper," "payment intangible" or "instrument" under the Uniform Commercial Code as in effect in the State of New York and any "supporting obligations" as so defined.

"Recovery Event" means any event, occurrence, claim or proceeding that results in any Net Award or Net Insurance Proceeds.

"Record Date" for the amount payable on any Payment Date means March 15, June 15, September 15 and December 15, (whether or not a Business Day) next preceding such Interest Payment Date.

#4834-6333-0618

"Refinancing Indebtedness" means Indebtedness that is Incurred to refund, refinance, replace, exchange, renew, repay or extend (including pursuant to any defeasance or discharge mechanism) (collectively, "refinance," "refinances," "refinanced" and "refinancing" shall each have a correlative meaning) any Indebtedness existing on the Issue Date or Incurred in compliance with this Indenture, defeasance costs, accrued interest and fees and expenses (including fees and expenses relating to the Incurrence of such Refinancing Indebtedness) in connection with any such refinancing) including Indebtedness that refinances Refinancing Indebtedness; *provided, however,* that:

(1)    (a) if the Stated Maturity of the Indebtedness being refinanced is earlier than the Stated Maturity of the Notes, the Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being refinanced or (b) if the Stated Maturity of the Indebtedness being refinanced is later than the Stated Maturity of the Notes, the Refinancing Indebtedness has a Stated Maturity at least 91 days later than the Stated Maturity of the Notes;

(2)    the Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Indebtedness being refinanced;

(3)    such Refinancing Indebtedness is Incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the sum of the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) then outstanding of the Indebtedness being refinanced (plus, without duplication, any additional Indebtedness Incurred to pay premiums required by the instruments governing such existing Indebtedness or reasonable tender premiums, as determined in good faith, defeasance costs, accrued interest and fees and expenses in connection with any such refinancing);

(4)    to the extent such Refinancing Indebtedness is secured, the Liens securing such Refinancing Indebtedness have a Lien priority equal with or junior to the Liens securing the Indebtedness being refunded, refinanced, replaced, exchanged, renewed, repaid or extended; and

(5)    if the Indebtedness being refinanced is subordinated in right of payment to the Notes or the Note Guarantees, such Refinancing Indebtedness is subordinated in right of payment to the Notes or the Note Guarantees on terms at least as favorable to the Holders as those contained in the documentation governing the Indebtedness being refinanced.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee having direct responsibility for the administration of this Indenture.

"Restricted Investment" means any Investment other than a Permitted Investment.

"Reuters Screen LIBOR01 Page" means the display designated on page "LIBOR01" on Reuters (or such other page as may replace the LIBOR01 page on that service or any successor service for the purpose of displaying London interbank offered rates for U.S. dollar deposits of major banks).

#4834-6333-0618

FILED: NEW YORK COUNTY CLERK 02/06/2020 Case 1:20-cv-02043-LJL Document 2-2 Filed 03/06/20 Page 38 of 114 INDEX NO. 650854/2020

NYSCEF DOC. NO. 4                                                        RECEIVED NYSCEF: 02/06/2020

"<u>Royalties and Other Costs</u>" means:

(1)     2016 royalties relating to that certain lease for Iron-Bearing Materials Canisteo Mine Second Tailings Basin North and South, between the State of Minnesota and the Debtor Company (later assigned to Mag Mining, LLC), dated October 3, 2011, as amended on December 15, 2013 and April 25, 2016;

(2)     2016 royalties relating to that certain lease for Iron-Bearing Materials Buckeye Tailings Basin #2, between the State of Minnesota and the Debtor Company (later assigned to Mag Mining, LLC), dated May 31, 2012, as amended on April 1, 2015;

(3)     the 2015 prepetition default amounts on the leases described in paragraphs (1) and (2) specifically being assumed as set forth in the applicable notice of assumption and assignment served on each non-debtor party to each such lease; and

(4)     amounts due in the first quarter of 2017 under the contracts with the State of Minnesota assigned to ERPI.

"<u>S&P</u>" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"<u>SEC</u>" means the U.S. Securities and Exchange Commission.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"<u>Security Agreement</u>" means the Security Agreement, dated on or about the date of the original issuance of the Notes hereunder, by and among the Issuer, certain other grantors party thereto from time to time and the Collateral Agent.

"<u>Senior Management</u>" means the chief executive officer and the chief financial officer of the Issuer.

"<u>Similar Business</u>" means any business conducted or proposed to be conducted by the Issuer and its Subsidiaries on the Issue Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"<u>Specified Event of Default</u>" means a quarterly interest payment Event of Default under Section 6.01(a)(1) that continues for a period of nine (9) consecutive months after the scheduled Interest Payment Date.

"<u>Stated Maturity</u>" means, with respect to any security, the date specified in the agreement governing or certificate relating to such Indebtedness as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision, but not including any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

#4834-6333-0618

"Subordinated Indebtedness" means any financing from any source, including Affiliates of the Issuer, incurred by the Issuer to meet its working capital requirements, which indebtedness is subordinated in right of payment to the Notes and the Note Guarantees.

"Subordination Agreement" means the Subordination Agreement, dated on or about the date of the original issuance of the Notes hereunder, by and among the Issuer, Progress and the Collateral Agent for and on behalf of the Holders.

"Subsidiary" of any Person means (1) any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total ordinary voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or Persons performing similar functions) or (2) any partnership, joint venture limited liability company or similar entity of which more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, is, in the case of clauses (1) and (2), at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more Subsidiaries of such Person or (c) one or more Subsidiaries of such Person. Unless otherwise specified herein, each reference to a Subsidiary shall refer to a Subsidiary of the Issuer.

"Transfer Restricted Notes" means Definitive Notes and any other Notes that bear or are required to bear the Restricted Notes Legend.

"Trust Indenture Act" means the Trust Indenture Act of 1939, as amended.

"Trustee" means the party named as such in the first paragraph of this Indenture, until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

"Voting Stock" of a Person means all classes of Capital Stock of such Person then outstanding and normally entitled to vote in the election of directors, managers or trustees, as applicable, of such Person.

"Wholly Owned Subsidiary" means a Subsidiary, all of the Capital Stock of which (other than directors' qualifying shares) is owned by an Obligor or another Wholly Owned Subsidiary.

Section 1.02    Other Definitions.

Term

| | Defined in Section |
|---|---|
| "Acceleration Effective Date" ............................................... | 6.02(a)(2) |
| "Acceleration Effective Date Notice"...................................... | 4.15(a) |
| "Additional Amounts" ........................................................... | 2.15(a) |

#4834-6333-0618

| Term | Defined in Section |
|---|---|
| "Affiliate Transaction" | 4.14 |
| "Agent Members" | 2.1(b) of Appendix A |
| "Applicable Procedures" | 1.1(a) of Appendix A |
| "Applicable Rate" | 2.14(a) |
| "Authentication Order" | 2.02(c) |
| "Clarke Redemption Date" | 6.02(b) |
| "Clarke Redemption Failure Notice" | 6.02(b) |
| "Clearstream" | 1.1(a) of Appendix A |
| "Deficiency Amount" | 6.02(b) |
| "Definitive Notes Legend" | 2.2(e) of Appendix A |
| "Distribution Compliance Period" | 1.1(a) of Appendix A |
| "ERISA" | 2.2(e) of Appendix A |
| "ERISA Legend" | 2.2(e) of Appendix A |
| "Euroclear" | 1.1(a) of Appendix A |
| "Event of Default" | 6.01(a) |
| "Event of Default Redemption" | 4.15(a) |
| "Event of Default Redemption Notice" | 6.02(b) |
| "Event of Default Redemption Payment Date" | 4.15(a) |
| "Event of Default Redemption Price" | 4.15(a) |
| "Expiration Date" | 1.05(j) |
| "First Standstill Expiration Date" | 6.02(b) |
| "Global Note" | 2.1(a) of Appendix A |
| "Global Notes Legend" | 2.2(e) of Appendix A |
| "Guaranteed Obligations" | 11.01(a) |
| "Guarantor Redemption Date" | 6.02(b) |
| "Guarantor Redemption Failure Notice" | 6.02(b) |
| "IAI" | 1.1(a) of Appendix A |
| "IAI Global Note" | 2.1(a) of Appendix A |
| "Interest Reset Date" | 2.14(a) |
| "Issuer Redemption Date" | 6.02(b) |
| "Issuer Redemption Failure Notice" | 6.02(b) |
| "Note Register" | 2.03(a) |
| "OID Notes Legend" | 2.2(e) of Appendix A |
| "Paying Agent" | 2.03(a) |
| "PDF" | 2.06(i) |
| "PIK Payment" | 2.01(a) |
| "QIB" | 1.1(a) of |

#4834-6333-0618

Term

| | Defined in Section |
|---|---|
| "Redemption Failure Notice" ................................................ | Appendix A 6.02(b) |
| "Registrar" ........................................................................ | 2.03(a) |
| "Regulation S" .................................................................. | 1.1(a) of Appendix A |
| "Regulation S Global Note" ................................................ | 2.1(a) of Appendix A |
| "Relevant Jurisdictions" .................................................... | 2.15(a) |
| "Relevant Taxing Jurisdiction" ........................................... | 2.15(a) |
| "Resale Restriction Termination Date" ................................. | 2.2(e) of Appendix A |
| "Restricted Notes Legend" ................................................. | 2.2(e) of Appendix A |
| "Restricted Payment" ......................................................... | 4.08 |
| "Rule 144" ........................................................................ | 1.1(a) of Appendix A |
| "Rule 144A" ...................................................................... | 1.1(a) of Appendix A |
| "Rule 144A Global Note" ................................................... | 2.1(a) of Appendix A |
| "Second Standstill Expiration Date" ................................... | 6.02(b) |
| "Section 4.15 Notice" ........................................................ | 4.15(b) |
| "Similar Laws" .................................................................. | 2.2(e) of Appendix A |
| "Standstill Period" ............................................................. | 6.02(b) |
| "Successor Company" ........................................................ | 5.01 |
| "Third Standstill Expiration Date" ...................................... | 6.02(b) |
| "Unrestricted Global Note" ................................................ | 1.1(a) of Appendix A |
| "U.S. Person" .................................................................... | 1.1(a) of Appendix A |

Section 1.03    Rules of Construction.

Unless the context otherwise requires:

(1)     a term defined in Section 1.01 or 1.02 has the meaning assigned to it therein;

(2)     an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)     "or" is not exclusive;

(4)     words in the singular include the plural, and words in the plural include the singular;

(5)     provisions apply to successive events and transactions;

-24-

#4834-6333-0618

NYSCEF DOC. NO. 4

RECEIVED NYSCEF: 02/06/2020

(6)     unless the context otherwise requires, any reference to an "Appendix," "Article," "Section," "clause," "Schedule" or "Exhibit" refers to an Appendix, Article, Section, clause, Schedule or Exhibit, as the case may be, of this Indenture;

(7)     the words "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not any particular Article, Section, clause or other subdivision;

(8)     "including" means including without limitation;

(9)     references to sections of, or rules under, the Securities Act or the Exchange Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time; and

(10)    unless otherwise provided, references to agreements and other instruments shall be deemed to include all amendments and other modifications to such agreements or instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Indenture.

Section 1.04    [Reserved]

Section 1.05    Acts of Holders.

(a)     Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing.  Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments or record or both are delivered to the Trustee and, where it is hereby expressly required, to the Issuer and the Guarantors.  Proof of execution of any such instrument or of a writing appointing any such agent, or the holding by any Person of a Note, shall be sufficient for any purpose of this Indenture and (subject to Section 7.01) conclusive in favor of the Trustee, the Issuer and the Guarantors, if made in the manner provided in this Section 1.05.

(b)     The fact and date of the execution by any Person of any such instrument or writing may be proved (1) by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof or (2) in any other manner deemed reasonably sufficient by the Trustee.  Where such execution is by or on behalf of any legal entity other than an individual, such certificate or affidavit shall also constitute proof of the authority of the Person executing the same.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

(c)     The ownership of Notes shall be proved by the Note Register.

(d)     Any request, demand, authorization, direction, notice, consent, waiver or

-25-

#4834-6333-0618

other action by the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of any action taken, suffered or omitted by the Trustee, the Issuer or the Guarantors in reliance thereon, whether or not notation of such action is made upon such Note.

(e)     The Issuer may set a record date for purposes of determining the identity of Holders entitled to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, or to vote on or consent to any action authorized or permitted to be taken by the Holders; *provided* that the Issuer may not set a record date for, and the provisions of this paragraph shall not apply with respect to, the giving or making of any notice, declaration, request or direction referred to in clause (f) below. Unless otherwise specified, if not set by the Issuer prior to the first solicitation of a Holder made by any Person in respect of any such action, or in the case of any such vote, prior to such vote, any such record date shall be the later of 30 days prior to the first solicitation of such consent or vote or the date of the most recent list of Holders furnished to the Trustee prior to such solicitation or vote. If any record date is set pursuant to this clause (e), the Holders on such record date, and only such Holders, shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action (including revocation of any action), whether or not such Holders remain Holders after such record date; *provided* that no such action shall be effective hereunder unless made, given or taken on or prior to the applicable Expiration Date by Holders of the requisite principal amount of Notes, or each affected Holder, as applicable, on such record date. Promptly after any record date is set pursuant to this paragraph, the Issuer, at its own expense, shall cause notice of such record date, the proposed action by Holders and the applicable Expiration Date to be given to the Trustee in writing and to each Holder in the manner set forth in Section 13.01.

(f)     The Trustee may set any day as a record date for the purpose of determining the Holders entitled to join in the giving or making of (1) any notice of default under Section 6.01(a), (2) any declaration of acceleration referred to in Section 4.15 or Section 6.02, (3) any direction referred to in Section 6.04 or (4) any request to pursue a remedy as permitted in Section 6.05. If any record date is set pursuant to this paragraph, the Holders on such record date, and no other Holders, shall be entitled to join in such notice, declaration, request or direction, whether or not such Holders remain Holders after such record date; *provided* that no such action shall be effective hereunder unless made, given or taken on or prior to the applicable Expiration Date by Holders of the requisite principal amount of Notes or each affected Holder, as applicable, on such record date. Promptly after any record date is set pursuant to this paragraph, the Trustee, at the Issuer's expense, shall cause notice of such record date, the proposed action by Holders and the applicable Expiration Date to be given to the Issuer and to each Holder in the manner set forth in Section 13.01.

(g)     Without limiting the foregoing, a Holder entitled to take any action hereunder with regard to any particular Note may do so with regard to all or any part of the principal amount of such Note or by one or more duly appointed agents, each of which may do so pursuant to such appointment with regard to all or any part of such principal amount. Any notice given or action taken by a Holder or its agents with regard to different parts of such principal amount pursuant to this paragraph shall have the same effect as if given or taken by separate Holders of each such different part.

-26-

#4834-6333-0618

Case 1:20-cv-02043-LJL Document 1-2 Filed 03/06/20 Page 44 of 114

    (h)     Without limiting the generality of the foregoing, a Holder, including a Depositary that is the Holder of a Global Note, may make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders, and a Depositary that is the Holder of a Global Note may provide its proxy or proxies to the beneficial owners of interests in any such Global Note through such Depositary's standing instructions and customary practices.

    (i)     The Issuer may fix a record date for the purpose of determining the Persons who are beneficial owners of interests in any Global Note held by a Depositary entitled under the procedures of such Depositary, if any, to make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders; *provided* that if such a record date is fixed, only the beneficial owners of interests in such Global Note on such record date or their duly appointed proxy or proxies shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action, whether or not such beneficial owners remain beneficial owners of interests in such Global Note after such record date. No such request, demand, authorization, direction, notice, consent, waiver or other action shall be effective hereunder unless made, given or taken on or prior to the applicable Expiration Date.

    (j)     With respect to any record date set pursuant to this Section 1.05, the party hereto that sets such record date may designate any day as the "Expiration Date" and from time to time may change the Expiration Date to any earlier or later day; *provided* that no such change shall be effective unless notice of the proposed new Expiration Date is given to the other party hereto in writing, and to each Holder of Notes in the manner set forth in Section 13.01, on or prior to both the existing and the new Expiration Date. If an Expiration Date is not designated with respect to any record date set pursuant to this Section 1.05, the party hereto which set such record date shall be deemed to have initially designated the 90th day after such record date as the Expiration Date with respect thereto, subject to its right to change the Expiration Date as provided in this clause (j).

ARTICLE 2

THE NOTES

Section 2.01    Form and Dating; Terms.

    (a)     Provisions relating to the Notes issued under this Indenture are set forth in Appendix A, which is hereby incorporated in and expressly made a part of this Indenture. The Notes and the Trustee's certificate of authentication shall each be substantially in the form of Exhibit A hereto, which is hereby incorporated in and expressly made a part of this Indenture. The Notes may have notations, legends or endorsements required by law, rules or agreements with national securities exchanges to which the Issuer or any Guarantor is subject, if any, or usage (*provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer). Each Note shall be dated the date of its authentication. Subject to the issuance of additional Notes or the increase in the principal amount of the Global Notes in order to evidence

-27-

PIK Interest (which additional Notes or increased principal amount shall be in denominations of $1.00 or any integral multiple of $1.00 in excess thereof), the Notes shall be issuable only in registered form without interest coupons and in denominations of $2,000 and any integral multiples of $1.00. On any Interest Payment Date on which the Issuer pays interest all or in part in PIK Interest (a "PIK Payment") with respect to a Global Note, the Trustee shall, subject to the Issuer's compliance with Section 2.14(d), increase the principal amount of such Global Note by an amount equal to the interest payable as PIK Interest, rounded up to the nearest whole dollar, for the relevant Interest Period on the principal amount of such Global Note as of the relevant Record Date for such Interest Payment Date, to the credit of the Holders of such Global Note on such Record Date and an adjustment shall be made on the books and records of the Trustee with respect to such Global Note to reflect such increase.

      (b)     The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is limited to $22,500,000, *provided* that nothing herein shall prevent the issuance of additional Notes or the increase in the aggregate principal amount of the Global Notes issuable hereunder in connection with the payment of PIK Interest.

      The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture, and the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

      Additional Notes issued from time to time by the Issuer in connection with the payment of PIK Interest shall be pari passu with the outstanding Notes, shall be consolidated with and form a single class with any outstanding Notes and shall have the same terms as to status, redemption or otherwise.

Section 2.02    Execution and Authentication.

      (a)     At least one Officer of the Issuer shall execute the Notes on behalf of the Issuer by manual or facsimile signature. If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

      (b)     A Note shall not be entitled to any benefit under this Indenture or be valid or obligatory for any purpose until authenticated substantially in the form of Exhibit A attached hereto by the manual signature of an authorized signatory of the Trustee. The signature shall be conclusive evidence that the Note has been duly authenticated and delivered under this Indenture.

      (c)     On each Issue Date, the Trustee shall, upon receipt of a written order of the Issuer signed by an Officer of the Issuer (an "Authentication Order"), authenticate and deliver the Notes specified in such Authentication Order.

      (d)     The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal

#4834-6333-0618

Case 1:20-cv-02043-LJL   Document 1-2   Filed 03/06/20   Page 46 of 114

with Holders, the Issuer or an Affiliate of the Issuer.

Section 2.03    Registrar, Paying Agent and Calculation Agent.

(a)    The Issuer shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("Registrar") and at least one office or agency where Notes may be presented for payment ("Paying Agent"). The Registrar shall keep a register of the Notes ("Note Register") and of their transfer and exchange. The Issuer may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar, and the term "Paying Agent" includes any additional paying agent. The Issuer may change any Paying Agent or Registrar without prior notice to any Holder. The Issuer shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Issuer fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such. The Issuer or any of its Subsidiaries may act as Paying Agent or Registrar.

(b)    The Issuer initially appoints The Depository Trust Company to act as Depositary with respect to the Global Notes. The Issuer initially appoints the Trustee to act as Paying Agent, Registrar and Calculation Agent for the Notes and to act as Custodian with respect to the Global Notes.

(c)    The Issuer may change the Paying Agent, Registrar or Calculation Agent without notice to the Holders. The Issuer or any of its Subsidiaries may act in any such capacity.

Section 2.04    Paying Agent to Hold Money in Trust.

The Issuer shall, no later than 11:00 a.m. (New York City time) on each due date for the payment of principal, premium and Additional Amounts, if any, and, subject to Section 2.14(a), interest on any of the Notes, deposit with a Paying Agent a sum sufficient to pay such amount, such sum to be held in trust for the Holders entitled to the same, and (unless such Paying Agent is the Trustee) the Issuer shall promptly notify the Trustee in writing of its action or failure so to act. Each Paying Agent shall promptly notify the Issuer in the event that there is deposited with such Paying Agent an amount in excess of the amount required to be paid on any such due date, and the Issuer shall be entitled to remittance of such excess amount. The Issuer shall require each Paying Agent other than the Trustee to agree in writing that such Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by such Paying Agent for the payment of principal, premium and Additional Amounts, if any, and interest on the Notes, and shall notify the Trustee of any default by the Issuer in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, a Paying Agent shall have no further liability for the money. If the Issuer or a Subsidiary acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Issuer, the Trustee shall serve as Paying Agent for the Notes.

Section 2.05    Holder Lists.

-29-

#4834-6333-0618

The Registrar shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders. If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee at least five Business Days after each Record Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders.

Section 2.06    Transfer and Exchange.

(a)    The Notes shall be issued in registered form and shall be transferable only upon the surrender of a Note for registration of transfer and in compliance with Appendix A.

(b)    To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 or at the Registrar's request.

(c)    No service charge shall be imposed in connection with any registration of transfer or exchange (other than pursuant to Section 2.07), but the Holders shall be required to pay any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10 and 9.05).

(d)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(e)    Neither the Issuer nor the Registrar shall be required to register the transfer of or to exchange any Note between a Record Date and the next succeeding Payment Date.

(f)    Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal, premium, if any, and (subject to the Record Date provisions of the Notes) interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer shall be affected by notice to the contrary.

(g)    Upon surrender for registration of transfer of any Note at the office of the Trustee as set forth in Section 13.01, the Issuer shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more replacement Notes of any authorized denomination or denominations of a like aggregate principal amount.

(h)    At the option of the Holder, Notes may be exchanged for other Notes of any authorized denomination or denominations of a like aggregate principal amount upon surrender of the Notes to be exchanged at such office or agency. Whenever any Global Notes or Definitive Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee shall authenticate and deliver, the replacement Global Notes and Definitive Notes which the Holder making the exchange is entitled to in accordance with the provisions of Appendix A.

-30-

#4834-6333-0618

FILED: NEW YORK COUNTY CLERK 02/06/2020 Case 1:20-cv-02043-LJL Document 1-2 Filed 03/06/20 Page 48 of 114 NO. 650854/2020

NYSCEF DOC. NO. 4                                                                                              RECEIVED NYSCEF: 02/06/2020

     (i)    All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by mail or by facsimile or transmission in portable document format ("PDF").

Section 2.07    Replacement Notes.

     If a mutilated Note is surrendered to the Trustee or if a Holder claims that its Note has been lost, destroyed or wrongfully taken and the Trustee receives evidence to its satisfaction of the ownership and loss, destruction or theft of such Note, the Issuer shall issue and the Trustee, upon receipt of an Authentication Order, shall authenticate a replacement Note if the Trustee's requirements are otherwise met. Such Holder shall furnish to the Issuer and to the Trustee such security or indemnity as may be required by them to save each of them harmless, and, in every case of destruction, loss, or theft, the Holder shall also furnish to the Issuer and to the Trustee evidence to their satisfaction of the destruction, loss or theft, of such Note and of the ownership thereof. The Issuer may charge the Holder for the expenses of the Issuer and the Trustee in replacing a Note. Every replacement Note is a contractual obligation of the Issuer and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder. Notwithstanding the foregoing provisions of this Section 2.07, in case any mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may, instead of issuing a new Note, pay such Note.

Section 2.08    Outstanding Notes.

     (a)    The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding. Except as set forth in Section 2.09, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

     (b)    If a Note is replaced pursuant to Section 2.07, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser, as such term is defined in Section 8-303 of the Uniform Commercial Code in effect in the State of New York.

     (c)    If the principal amount of any Note is considered paid under Section 4.01, it ceases to be outstanding and interest on it ceases to accrue from and after the date of such payment.

     (d)    If a Paying Agent (other than the Issuer, a Subsidiary or an Affiliate of any thereof) holds, on the maturity date or any redemption date, money sufficient to pay Notes payable or to be purchased on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

Section 2.09    Treasury Notes.

#4834-6333-0618

Case 1:20-cv-02043-LJL Document 1-2 Filed 03/06/20 Page 49 of 114

In determining whether the Holders of the requisite principal amount of Notes have concurred in any direction, waiver or consent, Notes beneficially owned by the Issuer or by any Affiliate of the Issuer, shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in conclusively relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee actually knows are so owned shall be so disregarded. Notes so owned which have been pledged in good faith shall not be disregarded if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to deliver any such direction, waiver or consent with respect to the Notes and that the pledgee is the Issuer or any obligor upon the Notes or any Affiliate of the Issuer or of such other obligor.

Section 2.10    Temporary Notes.

Until Definitive Notes are ready for delivery, the Issuer may prepare and the Trustee, upon receipt of an Authentication Order, shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes and as shall be reasonably acceptable to the Trustee. Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate Definitive Notes in exchange for temporary Notes. Holders and beneficial holders, as the case may be, of temporary Notes shall be entitled to all of the benefits accorded to Holders, or beneficial holders, respectively, of Notes under this Indenture.

Section 2.11    Cancellation.

The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee or, at the direction of the Trustee, the Registrar or the Paying Agent and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall dispose of such cancelled Notes in accordance with its customary procedures (subject to the record retention requirement of the Exchange Act). Certification of the cancellation of Notes delivered pursuant to this Section 2.11 shall, upon the written request of the Issuer, be delivered to the Issuer. The Issuer may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12    Defaulted Interest.

(a)    Upon the occurrence and during the continuance of an Event of Default, the outstanding principal amount of the Notes and any accrued and unpaid interest and all other overdue amounts shall each bear interest until paid to the Persons who are Holders on a subsequent special record date at the Applicable Rate, *plus* 2.00% per annum, as provided in the Notes and in Sections 2.14 and 4.01. The Issuer shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment, and at the same time the Issuer shall deposit with the Paying Agent an amount of money equal to the aggregate amount proposed to be paid in respect of such defaulted interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to

#4834-6333-0618

Case 1:20-cv-02043-LJL Document 1-2 Filed 03/06/20 Page 50 of 114

such defaulted interest as provided in this Section 2.12. The Trustee shall fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date shall be less than 10 days prior to the related payment date for such defaulted interest. The Trustee shall promptly notify the Issuer of such special record date. At least 15 days before the special record date, the Issuer (or, upon the written request of the Issuer, the Trustee in the name and at the expense of the Issuer) shall mail or deliver by electronic transmission in accordance with the applicable procedures of the Depositary, or cause to be mailed or delivered by electronic transmission in accordance with the applicable procedures of the Depositary to each Holder a notice that states the special record date, the related payment date and the amount of such interest to be paid.

(b)     Subject to the foregoing provisions of this Section 2.12 and for greater certainty, each Note delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights to interest accrued and unpaid, and to accrue interest, which were carried by such other Note.

Section 2.13    CUSIP and ISIN Numbers.

The Issuer in issuing the Notes may use CUSIP or ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP or ISIN numbers in notices of redemption or exchange as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption or exchange and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption or exchange shall not be affected by any defect in or omission of such numbers. The Issuer shall as promptly as practicable notify the Trustee in writing of any change in the CUSIP or ISIN numbers.

Section 2.14    Interest.

(a)     (1) Interest on the Notes shall accrue from and including the most recent date to which interest has been paid (or, if no interest has been paid, from the Issue Date) through but excluding the date on which interest is paid. Interest shall be payable quarterly in arrears on each Interest Payment Date in cash, commencing the date of the original issuance of the Notes hereunder at a rate per annum equal to LIBOR plus 8.00% (the "Applicable Rate"); *provided* that for Interest Payment Dates prior to the Interest Payment Date on June 30, 2017, the Issuer may elect, prior to the beginning of such Interest Period, to pay some or all interest as PIK Interest and, if the Issuer so elects, the Issuer shall deliver to the Trustee and the Paying Agent written notification, executed by an Officer of the Issuer, substantially in the form of Exhibit D, setting forth such election at any time prior to the first day of the applicable Interest Period (and the Trustee shall furnish a copy thereof to the Holders in accordance with the applicable procedures of the Depository). In the event that the Issuer is entitled to and elects to pay Partial PIK Interest for an Interest Period, each Holder shall be entitled to receive Cash Interest in respect of the applicable percentage of the principal amount of the Notes held by such Holder on the relevant Record Date and PIK Interest in respect of the remaining percentage of the principal amount of the Notes held by such Holder on the relevant Record Date. Following an increase in the principal amount of the outstanding Global Notes as a result of a PIK Payment, the Notes shall

-33-

#4834-6333-0618

bear interest on such increased principal amount from and after the date of such PIK Payment. With respect to any PIK Payment in the form of Definitive Notes, no later than 10 Business Days prior to the relevant Interest Payment Date the Issuer shall deliver to the Trustee and the Paying Agent (if other than the Trustee) an Authentication Order to authenticate on the relevant Interest Payment Date new Notes in the required principal amount (rounded up to the nearest whole dollar) (the "PIK Notes"), and the Trustee will, on the relevant Interest Payment Date, authenticate and deliver such PIK Notes in certificated form for original issuance to the Holders of Definitive Notes on the relevant Record Date, as shown by the records of the register of Holders. Each PIK Note so issued will be dated as of the applicable Interest Payment Date and will bear interest from and after such date. Any payment of PIK Interest shall be deemed to be payment in full to the same extent as if it were paid in cash.

   (2) The rate of interest shall be reset on the first day of each Interest Period other than the Initial Interest Period (the date on which each such reset occurs, an "Interest Reset Date").

   (b) On or before each Calculation Date, the Calculation Agent shall determine the Applicable Rate and notify the Issuer and the Paying Agent. The Calculation Agent shall, upon the written request of any Holder of the Notes, provide the interest rate then in effect with respect to the Notes. All calculations of the Calculation Agent, in the absence of manifest error, shall be conclusive for all purposes and binding on the Issuer and Guarantors and the Holders of the Notes and neither the Trustee nor the Paying Agent shall have the duty to verify determinations of interest rates made by the Calculation Agent.

   (c) If the due date for any payment in respect of any Notes is not a Business Day at the place at which such payment is due to be paid, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place, and shall not be entitled to any further interest or other payment as a result of any such delay.

   (d) No later than 10 (ten) days prior to the relevant Interest Payment Date in connection with any PIK Payment, the Issuer shall deliver to the Trustee and the Paying Agent (if other than the Trustee) written notification, executed by an Officer of the Issuer, substantially in the form of Exhibit E hereto, setting forth the amount of PIK Interest to be paid on such Interest Payment Date and directing the Trustee and the Paying Agent (if other than the Trustee) to issue PIK Notes or increase the principal amount of the Global Notes in accordance with this paragraph and Section 2.14(a), which notification the Trustee and Paying Agent shall be entitled to rely upon.

Section 2.15 Additional Amounts

   (a) All payments by or on behalf of the Issuer, a Successor Company or a Guarantor of principal of, and premium (if any) and interest on the Notes or under any applicable Guarantees shall be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within any jurisdiction in which the Issuer, a Successor Company or an applicable Guarantor is organized or resident for tax purposes or any political subdivision or taxing authority thereof or therein (each, as applicable, a "Relevant Taxing Jurisdiction") or any

#4834-6333-0618

Case 1:20-cv-02043-LJL   Document 1-2   Filed 03/06/20   Page 52 of 114

jurisdiction through which payment is made or any political subdivision or taxing authority thereof or therein (together with the Relevant Taxing Jurisdictions, the "Relevant Jurisdictions"), unless such withholding or deduction is required by law or by regulation or governmental policy having the force of law. In the event that any such withholding or deduction is so required, the Issuer, a Successor Company or the applicable Guarantor, as the case may be, shall pay such additional amounts ("Additional Amounts") as shall result in receipt by the Holder of each Note or the Guarantees, as the case may be, of such amounts as would have been received by such Holder had no such withholding or deduction been required, except that no Additional Amounts shall be payable:

> (1)    for or on account of:

>> (A)    any tax, duty, assessment or other governmental charge that would not have been imposed but for:

>>> (i)    the existence of any present or former connection between the Holder or beneficial owner of such Note or Guarantee, as the case may be, and the Relevant Jurisdiction other than merely holding such Note or the receipt of payments thereunder or under a Guarantee, including, without limitation, such Holder or beneficial owner being or having been a national, domiciliary or resident of such Relevant Jurisdiction or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having or having had a permanent establishment therein;

>> (B)    the presentation of such Note (in cases in which presentation is required) more than 30 days after the later of the date on which the payment of the principal of, premium, if any, and interest on, such Note became due and payable pursuant to the terms thereof or was made or duly provided for, except to the extent that the Holder thereof would have been entitled to such Additional Amounts if it had presented such Note for payment on any date within such 30-day period; or

>> (C)    the failure of the Holder or beneficial owner to comply with a timely request of the Issuer, a Successor Company or any Guarantor addressed to the Holder to provide information concerning such Holder's or beneficial owner's nationality, residence, identity or connection with any Relevant Jurisdiction, if and to the extent that due and timely compliance with such request would have reduced or eliminated any withholding or deduction as to which Additional Amounts would have otherwise been payable to such Holder;

>> (D)    any estate, inheritance, gift, sale, transfer, personal property or similar tax, assessment or other governmental charge;

>> (E)    any withholding or deduction that is required to be made pursuant to European Council Directive 2003/48/EC on the taxation of savings income or any other Directive amending, supplementing or replacing such Directive, or any

#4834-6333-0618

law implementing or complying with, or introduced in order to conform to, such Directives;

(F) any tax, duty, assessment or other governmental charge to the extent such tax, duty, assessment or other governmental charge results from the presentation of the Note (where presentation is required) for payment and the payment can be made without such withholding or deduction by the presentation of the Note for payment elsewhere;

(G) any combination of taxes, duties, assessments or other governmental charges referred to in the preceding clauses (A), (B), (C) and (D); or

(H) to a Holder that is a fiduciary, partnership or person other than the sole beneficial owner of any payment to the extent that such payment would be required to be included in the income under the laws of a Relevant Jurisdiction, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, or a member of that partnership or a beneficial owner who would not have been entitled to such Additional Amounts had that beneficiary, settlor, partner or beneficial owner been the Holder thereof.

(2) The Issuer shall (i) make such withholding or deduction and (ii) remit the full amount deducted or withheld to the relevant authority in accordance with applicable law. The Issuer shall, upon request by any Holder, make reasonable efforts to obtain certified copies of tax receipts evidencing the payment of any taxes so deducted or withheld from the Relevant Jurisdiction imposing such taxes. Upon request by any Holder, the Issuer shall furnish to Holders, within 60 days after the date the payment of any taxes so deducted or withheld is due pursuant to applicable law, either certified copies of tax receipts evidencing such payment or, if such receipts are not obtainable, other evidence of such payments.

(3) At least 30 days prior to each date on which any payment under or with respect to the Notes is due and payable, if the Issuer shall be obligated to pay Additional Amounts with respect to such payment, the Issuer shall deliver to the Trustee an Officer's Certificate stating the fact that such Additional Amounts will be payable and the amounts so payable and shall set forth such other information necessary to enable the Paying Agent to pay such Additional Amounts to the Holders on such payment date.

(4) In addition, the Issuer shall pay any stamp, issue, registration, documentary, value added or other similar taxes and other duties (including interest and penalties) payable in any Relevant Jurisdiction in respect of the creation, issue, offering, execution or enforcement of the Notes, or any documentation with respect thereto.

(5) Whenever there is mentioned in any context the payment of principal of, and any premium or interest on, any Note or under any Guarantee, such mention shall be deemed to include payment of Additional Amounts provided for in this Indenture to the extent that, in such context, Additional Amounts are, were or would be payable in respect

#4834-6333-0618

thereof.

# ARTICLE 3

## REDEMPTION

Section 3.01    Notices to Trustee.

(a)    If the Issuer elects to redeem Notes pursuant to Section 3.06, it shall furnish to the Trustee, at least two Business Days before notice of redemption is required to be mailed or delivered to Holders pursuant to Section 3.03 (unless a shorter notice shall be agreed to by the Trustee) but not more than 60 days before a redemption date, an Officers' Certificate setting forth (1) the paragraph or subparagraph of such Note or Section of this Indenture pursuant to which the redemption shall occur, (2) the redemption date, (3) the principal amount of the Notes to be redeemed, (4) the redemption price, if then ascertainable and (5) if applicable, any conditions to such redemption.

Section 3.02    Selection of Notes to be Redeemed or Purchased in Part

If less than all of the Notes are to be redeemed at any time (including, for the avoidance of doubt, under Section 4.15), selection of Notes for redemption shall be made by the Trustee by lot; *provided* that no Notes of $2,000 or less shall be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption that relates to such Notes shall state the portion of the principal amount thereof to be redeemed.

Section 3.03    Notice of Redemption.

(a)    The Issuer shall mail or deliver by electronic transmission in accordance with the applicable procedures of the Depositary, or cause to be mailed (or delivered by electronic transmission in accordance with the applicable procedures of the Depositary) notices of redemption of Notes not less than 30 days but not more than 60 days before the redemption date to each Holder whose Notes are to be redeemed pursuant to this Article at such Holder's registered address or otherwise in accordance with the applicable procedures of the Depositary, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with Article 8 or Article 12.

(b)    The notice shall identify the Notes to be redeemed (including CUSIP and ISIN number, if applicable) and shall state:

(1)    the redemption date;

(2)    the redemption price, including the portion thereof representing any accrued and unpaid interest; *provided* that in connection with a redemption under Section 3.06(a), the notice need not set forth the redemption price but only the manner of calculation thereof;

(3)    the name and address of the Paying Agent;

-37-

#4834-6333-0618

(4)     that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(5)     that, unless the Issuer defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(6)     the paragraph or subparagraph of the Notes or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(7)     that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in such notice or printed on the Notes;

(8)     if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the applicable redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note; and

(9)     if applicable, any condition to such redemption.

(c)     At the Issuer's request, the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense; *provided* that the Issuer shall have delivered to the Trustee, at least five Business Days before notice of redemption is required to be sent or caused to be sent to Holders pursuant to this Section 3.03 (unless a shorter notice shall be agreed to by the Trustee), an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in Section 3.03(b).

(d)     If any Note is to be redeemed in part only, the notice of redemption that relates to that Note shall state the portion of the principal amount thereof to be redeemed, in which case a portion of the original Note will be issued in the name of the Holder thereof upon cancellation of the original Note. In the case of a Global Note, an appropriate notation will be made on such Note to decrease the principal amount thereof to an amount equal to the unredeemed portion thereof. Subject to the terms of the applicable redemption notice (including any conditions contained therein), Notes called for redemption become due on the date fixed for redemption. On and after the applicable redemption date, unless the Issuer defaults in the payment of the applicable redemption price, interest ceases to accrue on Notes or portions of them called for redemption.

Section 3.04     Effect of Notice of Redemption.

Once notice of redemption is mailed or delivered in accordance with Section 3.03, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price. The notice, if mailed or delivered by electronic transmission in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Holder receives such notice. In any case, failure to give such notice or any defect in the notice to the Holder of any Note designated for redemption shall not affect the validity of the proceedings for the redemption of any other Note. Subject to Section 3.05, on and after the redemption date,

-38-

interest ceases to accrue on Notes or portions of Notes called for redemption.

Section 3.05    Deposit of Redemption or Purchase Price.

(a)    No later than 11:00 a.m. (New York City time) on the Business Day prior to the redemption or purchase date, the Issuer shall deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued and unpaid interest and Additional Amounts, if any, on all Notes to be redeemed or purchased on that date. If a Note is redeemed or purchased on or after a Record Date but on or prior to the related Payment Date, then any accrued and unpaid interest shall be paid to the Holder of record on such Record Date. The Paying Agent shall promptly mail to each Holder whose Notes are to be redeemed or repurchased the applicable redemption or purchase price thereof and accrued and unpaid interest and Additional Amounts, if any, thereon. The Trustee or the Paying Agent shall promptly return to the Issuer any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption or purchase price of, and accrued and unpaid interest and Additional Amounts, if any, on all Notes to be redeemed or purchased.

(b)    If the Issuer complies with the provisions of Section 3.05(a), on and after the redemption or purchase date, interest shall cease to accrue on the Notes called for redemption or purchase. If a Note is redeemed or purchased on or after a Record Date but on or prior to the related Payment Date, then any accrued and unpaid interest to the redemption or purchase date in respect of such Note shall be paid on such redemption or purchase date to the Person in whose name such Note is registered at the close of business on such Record Date. If any Note called for redemption or purchase shall not be so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with Section 3.05(a), interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and, to the extent lawful, on any interest accrued to the redemption or purchase date not paid on such unpaid principal, in each case at the rate provided in the Notes and in Sections 2.12 and Section 4.01.

Section 3.06    Optional Redemption.

(a)    The Issuer may, at any time, redeem the Notes, in whole or in part, upon notice pursuant to Section 3.03 at a redemption price equal to 100% of the aggregate principal amount of the Notes *plus* accrued and unpaid interest and Additional Amounts, if any, thereon, if any, to the redemption date. Promptly after the determination thereof, the Issuer shall give the Trustee notice of the redemption price provided for in this Section 3.06(a), and the Trustee shall not be responsible for such calculation.

(b)    Except pursuant to clause (a) of this Section 3.06, to the extent applicable, the Notes shall not be redeemable at the Issuer's option.

(c)    Any redemption pursuant to this Section 3.06 shall be made pursuant to the provisions of Sections 3.01 through 3.05.

(d)    Any redemption notice in connection with this Section 3.06 may, at the Issuer's discretion, be subject to one or more conditions precedent.

#4834-6333-0618

Section 3.07    Mandatory Redemption.

        The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes other than as set forth in Section 6.02.

Section 3.08    Notes Redeemed or Purchased in Part

        Upon surrender of a Note that is redeemed or purchased in part, the Issuer will issue and, upon receipt of an Authentication Order from the Issuer, the Trustee will authenticate for the Holder at the expense of the Issuer a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered; *provided* that each such new Note will be in a principal amount of $2,000 or integral multiple of $1.00 in excess thereof.

ARTICLE 4

COVENANTS

Section 4.01    Payment of Notes.

        (a)    (1) The Issuer shall pay, or cause to be paid, the principal, premium and Additional Amounts, if any, and interest on the Notes on the dates and in the manner provided in the Notes. Principal, premium and Additional Amounts, if any, and interest shall be considered paid on the date due if the Paying Agent, if other than the Issuer or a Subsidiary, holds as of 11:00 a.m. (New York City) time, on the due date money deposited by the Issuer in immediately available funds and designated for and sufficient to pay the principal, premium and Additional Amounts, if any, and interest then due, *provided* that PIK Interest shall be considered paid on the date due if in accordance with the terms hereof and of the Notes, PIK Notes are issued or and the principal amount of the applicable Global Notes is increased in an amount equal to the amount of the applicable amount of interest pursuant to Section 2.01(a).

        (2)    Notwithstanding whether the Issuer has elected to pay PIK Interest, beginning on June 30, 2017 and on each Amortization Payment Date thereafter, the Issuer shall make quarterly payments of the Amortization Amount in cash in immediately available funds in lawful money of the United States of America, by wire transfer to the bank account designated by the Trustee or Paying Agent in writing from time to time not later than 11:00 a.m. (New York City time) on such date.

        (b)    The Issuer shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, at the rate equal to the then applicable interest rate on the Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) at the same rate on the Notes to the extent lawful.

Section 4.02    Prepayment of Notes

        The Issuer may at any time and from time to time prepay any principal amount of the Notes in whole or in part without premium or penalty, pursuant to Article 3.

-40-

Section 4.03    Taxes

       Each Obligor shall pay, and shall cause each of its Subsidiaries to pay, prior to delinquency, all taxes, assessments and governmental levies except (a) such as are being contested in good faith and by appropriate negotiations or proceedings or (b) where the failure to effect such payment is not adverse in any material respect to the Holders.

Section 4.04    Stay, Extension and Usury Laws

       Each Obligor covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and each Obligor (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenant that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.05    Corporate Existence.

       Subject to Article 5, each Obligor shall do or cause to be done all things necessary to preserve and keep in full force and effect (1) its corporate or limited liability company existence and the corporate, partnership, limited liability company or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of such Obligor or any such Subsidiary and (2) the rights (charter and statutory), licenses and franchises of such Obligor and its Subsidiaries; *provided* that such Obligor shall not be required to preserve any such right, license or franchise, or the corporate, partnership, limited liability company or other existence of any of its Subsidiaries, if such Obligor in good faith shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Obligor and its Subsidiaries, taken as a whole.

Section 4.06    Reports and Other Information

       (a)    Notwithstanding that the Issuer may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, each of the Issuer and the Coke Guarantor shall provide to the Holders the following reports:

       (1)    within 120 days after the end of each fiscal year, beginning April 30, 2018 for the Issuer's 2017 fiscal year, audited consolidated annual financial statements with all notes related thereto, prepared in accordance with GAAP as in effect on the date thereof; and

       (2)    within 45 days after the end of each of the first three fiscal quarters of each fiscal year, quarterly consolidated financial statements containing substantially the same information as in their annual financial statements including notes relating thereto, prepared in accordance with GAAP as in effect on the date thereof.

       (b)    To the extent not satisfied by Section 4.06(a), for so long as any Notes are

#4834-6333-0618

outstanding, the Issuer shall furnish to Holders and to securities analysts and prospective purchasers of the Notes, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act. The requirements set forth in this Section 4.06(b) and Section 4.06(a) may be satisfied by delivering such information to the Trustee and posting copies of such information on a website (which may be nonpublic and may be maintained by the Issuer or a third party) to which access will be given to Holders, prospective purchasers of the Notes (which prospective purchasers will be limited to QIBs) or non-U.S. persons (as defined in Regulation S), securities analysts and market making institutions that certify their status as such to the reasonable satisfaction of the Issuer.

(c)　In the event that any direct or indirect parent company of the Issuer becomes a Guarantor of the Notes, the Issuer may satisfy its obligations under this Section 4.06 to provide consolidated financial information of the Issuer by furnishing consolidated financial information relating to such parent; *provided* that (1) such financial statements are accompanied by consolidating financial information for such parent, the Issuer and the Subsidiaries in the manner prescribed by the SEC and (2) such parent is not engaged in any business in any material respect other than such activities as are incidental to its ownership, directly or indirectly, of the Capital Stock of the Issuer.

Section 4.07　[Reserved]

Section 4.08　Limitation on Restricted Payments.

Each Obligor shall not, and shall not permit any of its Subsidiaries, directly or indirectly, to

(1)　declare or pay any dividend or make any distribution (whether made in cash, securities or other property) on or in respect of its or any of its Subsidiaries' Capital Stock (including any payment in connection with any merger or consolidation involving such Obligor or any of its Subsidiaries), other than dividends or distributions by a Subsidiary, so long as, in the case of any dividend or distribution payable on or in respect of any Capital Stock issued by a Subsidiary that is not a Wholly Owned Subsidiary, the Obligor or the Subsidiary holding such Capital Stock receives at least its pro rata share of such dividend or distribution;

(2)　purchase, redeem, retire or otherwise acquire for value, including in connection with any merger or consolidation, any Capital Stock of such Obligor or any direct or indirect parent of such Obligor held by Persons other than such Obligor or a Subsidiary thereof;

(3)　make any principal payment on, or purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to any scheduled repayment, scheduled sinking fund payment or scheduled maturity, any junior obligations, other than:

(A)　Indebtedness of such Obligor owing to and held by any of its Subsidiaries, or Indebtedness of any such Subsidiary owing to and held by such Obligor or any other Subsidiary, permitted under clause (5) of Section 4.09(b); or

#4834-6333-0618

(B)      the purchase, repurchase, redemption, defeasance or other acquisition or retirement of junior obligations of any Guarantor purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase, redemption, defeasance or other acquisition or retirement; or

(4)      make any Restricted Investment (all such payments and other actions referred to in clauses (1) through (4) of this Section 4.08 (other than any exception thereto) shall be referred to as a "Restricted Payment").

Section 4.09    Limitation on Indebtedness.

(a)      Each Obligor shall not, and shall not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock.

(b)      The provisions of Section 4.09(a) shall not prohibit the Incurrence of the following Indebtedness:

(1)      the incurrence by any Obligor of Indebtedness represented by the Notes and the related Note Guarantees to be issued on the Issue Date;

(2)      Indebtedness existing on the date of the original issuance of the Notes hereunder (other than Indebtedness described in clauses (1), (4) and (5));

(3)      Indebtedness for the Issuer and its Subsidiaries in an aggregate principal amount not exceeding at any time outstanding (a) $5.0 million or (b) with the consent of the Holders of a majority in principal amount of the Notes then outstanding voting as a single class, $10.0 million;

(4)      Indebtedness Incurred by an Obligor or their Subsidiaries in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance, self-insurance obligations, performance, bid, surety and similar bonds and completion Guarantees (not for borrowed money) provided in the ordinary course of business;

(5)      Indebtedness of an Obligor owing to and held by any of its Subsidiaries or Indebtedness of a Subsidiary of an Obligor owing to and held by such Obligor or any other Subsidiary of such Obligor; provided, however, (i) any subsequent issuance or transfer of Capital Stock or any other event which results in any such Indebtedness being beneficially held by a Person other than an Obligor or a Subsidiary of an Obligor; and

(i)      any sale or other transfer of any such Indebtedness to a Person other than an Obligor or a Subsidiary of an Obligor shall be deemed, in each case under this clause (5) of this Section 4.09(b), to constitute an Incurrence of such Indebtedness by such Obligor or such Subsidiary, as the case may be;

-43-

(6)     the Incurrence by an Obligor or any of their Subsidiaries of Refinancing Indebtedness that serves to refund or refinance any Indebtedness Incurred as permitted under Section 4.09(a) and clauses (1), (2), (3) and this clause (6) of this Section 4.09(b);

(7)     Preferred Stock of a Subsidiary of an Obligor held by such Obligor or any other Subsidiary of such Obligor; provided, however, (A) any subsequent issuance or transfer of Capital Stock or any other event which results in such Preferred Stock being beneficially held by a Person other than such Obligor or a Subsidiary of such Obligor; and (B) any sale or other transfer of any such Preferred Stock to a Person other than such Obligor or a Subsidiary of such Obligor shall be deemed in each case under this clause (7) to constitute an Incurrence of such Preferred Stock by such Subsidiary;

(8)     Indebtedness of Persons Incurred and outstanding on the date on which such Person became a Subsidiary of, or was acquired by, or merged into, an Obligor or any Subsidiary of any Obligor (other than Indebtedness Incurred (A) to provide all or any portion of the funds utilized to consummate the transaction or series of related transactions pursuant to which such Subsidiary became a Subsidiary of an Obligor or was otherwise acquired by an Obligor or (B) otherwise in connection with, or in contemplation of, such acquisition); provided, however, that the Incurrence of such Indebtedness does not materially impair the ability of the Issuer or the Guarantors to pay interest, principal and Amortization Amounts on the Notes; and

(9)     Indebtedness arising from agreements of an Obligor or a Subsidiary of any Obligor providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred or assumed in connection with the disposition of any business or assets of such Obligor or any business, assets or Capital Stock of a Subsidiary of such Obligor, other than Guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary of an Obligor for the purpose of financing such acquisition; provided that:

(A)     the maximum aggregate liability in respect of all such Indebtedness shall at no time exceed the gross proceeds including non-cash proceeds (the Fair Market Value of such non-cash proceeds being measured at the time received and without giving effect to subsequent changes in value) actually received by such Obligor and its Subsidiaries in connection with such disposition; and

(B)     such Indebtedness is not reflected on the balance sheet of such Obligor or any of its Subsidiaries (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet will not be deemed to be reflected on such balance sheet for purposes of this clause (9)),

and the Incurrence of such Indebtedness does not materially impair the ability of any Obligor to pay interest, principal and Amortization Amounts on the Notes;

(10)     Subordinated Indebtedness;

(11)     the ML Note;

-44-

     (12)    Indebtedness Incurred by the Coke Guarantor in an aggregate principal amount not exceeding at any time outstanding $10.0 million for working capital purposes; and

     (13)    Indebtedness Incurred pursuant to sections 2.03 and 2.05 of the APA. For the avoidance of doubt, to the extent liabilities assumed pursuant to sections 2.03 and 2.05 of the APA do not constitute Indebtedness, no additional Indebtedness shall be permitted to be incurred to satisfy such obligations other than as permitted pursuant to this Indenture.

Section 4.10    Limitation on Liens.

     Each Obligor shall not, and shall not permit any of their Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, other than Permitted Liens.

Section 4.11    Future Guarantors.

     (a)    After the Issue Date, each Obligor shall cause each of its Subsidiaries (other than a Foreign Subsidiary) created or acquired by such Obligor or one or more of its Subsidiaries to execute and deliver to the Trustee a supplemental indenture to the Indenture pursuant to which such Subsidiary shall irrevocably and unconditionally Guarantee, on a joint and several basis, the full and prompt payment of the principal of, premium, if any, and interest on the Notes and all other Obligations of the Issuer under the Notes Documents on a senior secured first-priority basis.

     (b)    The Obligations of each Guarantor shall be limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the Obligations of such other Guarantor under its Note Guarantee or pursuant to its contribution Obligations under the Indenture, result in the Obligations of such Guarantor under its Note Guarantee not constituting a fraudulent conveyance or fraudulent transfer under federal or state law.

     (c)    Each Person that becomes a Guarantor after the Issue Date shall also become a party to the applicable Collateral Documents and shall as promptly as practicable execute and deliver such security instruments, financing statements, mortgages, deeds of trust (in substantially the same form as those executed and delivered with respect to the Collateral on the Issue Date or on the date first delivered in the case of Mortgages and certificates and opinions of counsel (to the extent, and substantially in the form, delivered on the Issue Date or the date first delivered in the case of Mortgages (but no greater scope)) as may be necessary to vest in the Collateral Agent a perfected first-priority security interest (subject to Permitted Liens) in properties and assets that constitute Collateral as security for the Notes or the Note Guarantees and as may be necessary to have such property or asset added to the applicable Collateral as required under the Collateral Documents and the Indenture, and thereupon all provisions of the Indenture relating to the Collateral shall be deemed to relate to such properties and assets to the

#4834-6333-0618

same extent and with the same force and effect.

(d)     Each Note Guarantee shall be released in accordance with the provisions of Section 11.06.

Section 4.12     Limitation on Restrictions on Distribution From Subsidiaries

(a)     No Obligor shall, or shall permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any consensual encumbrance or consensual restriction on the ability of such Obligor or any such Subsidiary to:

(1)     pay dividends or make any other distributions on its Capital Stock to an Obligor or any of its Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness or other obligations owed to an Obligor or any Subsidiary of an Obligor (it being understood that the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on Common Stock shall not be deemed a restriction on the ability to make distributions on Capital Stock);

(2)     make any loans or advances to an Obligor or any Subsidiary (it being understood that the subordination of loans or advances made to an Obligor or any Subsidiary to other Indebtedness Incurred by such Obligor or any such Subsidiary shall not be deemed a restriction on the ability to make loans or advances); or

(3)     sell, lease or transfer any of its property or assets to an Obligor or any Subsidiary of any Obligor (it being understood that such transfers shall not include any type of transfer described in clause (1) or (2) of this Section 4.13(a)).

(b)     Section 4.12(a) shall not prohibit encumbrances or restrictions existing under or by reason of:

(1)     contractual encumbrances or restrictions pursuant to the Collateral Documents and related documentation and other agreements or instruments in effect at or entered into on the Issue Date;

(2)     this Indenture, the Notes and the Note Guarantees;

(3)     any agreement or other instrument of a Person acquired by an Obligor or any of its Subsidiaries in existence at the time of such acquisition (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired (including after-acquired property);

(4)     any amendment, restatement, modification, renewal, supplement, refunding, replacement or refinancing of an agreement referred to in clauses (1), (2) or (3) of this Section 4.12(b) or this clause (4) of this Section 4.12(b); provided, however, that such amendments, restatements, modifications, renewals, supplements, refundings,

-46-

#4834-6333-0618

replacements or refinancings are, in the good faith determination of the Senior Management of the applicable Obligor, no more restrictive than the encumbrances and restrictions contained the agreements referred to in clauses (1), (2) or (3) of this Section 4.12(b) on the Issue Date or the date an applicable Subsidiary became a Subsidiary of any such Obligor or was merged into a Subsidiary of any such Obligor, whichever is applicable;

(5)     any customary provisions in leases, subleases or licenses and other agreements entered into by an Obligor or any Subsidiary of such Obligor in the ordinary course of business;

(6)     encumbrances or restrictions arising or existing by reason of applicable law or any applicable rule, regulation or order; or

(7)     Indebtedness Incurred or Preferred Stock issued by a Subsidiary of an Obligor permitted to be Incurred pursuant to Section 4.09 that, in the good faith determination of the Board of Directors of the applicable Obligor, are not more restrictive, taken as a whole, than those applicable to such Obligor in this Indenture on the Issue Date (which results in encumbrances or restrictions at a Subsidiary level comparable to those applicable to such Obligor); provided that such encumbrances or restrictions shall not materially affect the Issuer's or the Guarantor's ability to make anticipated principal and interest payments on the Notes (in the good faith determination of the Board of Directors of such Obligor).

Section 4.13    Limitations on Investments, Loans, Advances, Guarantees and Acquisitions.

No Obligor shall, or shall permit any of its Subsidiaries to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a Subsidiary or otherwise a Guarantor prior to such merger) any Capital Stock, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except Permitted Investments. and investments by such Obligor existing on the date of the original issuance of the Notes hereunder in the Capital Stock of its Subsidiaries.

Section 4.14    Transactions with Affiliates

(a)     No Obligor shall, or shall permit any of its Subsidiaries to, directly or indirectly, enter into or conduct any transaction (including the purchase, sale, lease or exchange of any property or asset or the rendering of any service) with any Affiliate of such Obligor (an "Affiliate Transaction"), other than when:

(1)     the terms of such Affiliate Transaction are no less favorable to such Obligor or such Subsidiary, as the case may be, than those that could have been obtained by such Obligor or such Subsidiary in a comparable transaction at the time of such transaction in arms' length dealings with a Person that is not an Affiliate;

-47-

(2)    in the event such Affiliate Transaction involves an aggregate consideration in excess of $1.0 million, the terms of such transaction have been approved by a majority of the members of the Board of Directors of such Obligor and by a majority of the members of such Board of Directors having no personal stake in such transaction, if any (and such majority determines that such Affiliate Transaction satisfies the criteria in clause (1) of this Section 4.14(a)); and

(3)    in the event such Affiliate Transaction involves an aggregate consideration in excess of $2.0 million, such Obligor has received a written opinion from an Independent Financial Advisor stating that such Affiliate Transaction is fair to such Obligor or such Subsidiary from a financial point of view or stating that the terms are not materially less favorable than those that could have been obtained by such Obligor or such Subsidiary in a comparable transaction at such time on arms' length basis from a Person that is not an Affiliate.

(b)    Section 4.14(a) shall not apply to:

(1)    any transaction between the Issuer and the Coke Guarantor or between any Obligor and its Subsidiaries or between the Issuer and the Subsidiaries of the Coke Guarantor or between the Coke Guarantor and the Subsidiaries of the Issuer, and any Guarantees issued by an Obligor or a Subsidiary of any Obligor for the benefit of any other Obligor or any other Subsidiary of any Obligor, as the case may be, in accordance with Section 4.09;

(2)    Restricted Payments permitted to be made pursuant to Section 4.08 or Permitted Investments;

(3)    any agreement as in effect as of the Issue Date, as these agreements may be amended, modified, supplemented, extended or renewed from time to time, so long as any such amendment, modification, supplement, extension or renewal is not more disadvantageous to the Holders in any material respect in the good faith judgment of the Board of Directors of the applicable Obligor, when taken as a whole, than the terms of the agreements in effect on the Issue Date; provided that such amendment, modification, supplement, extension or renewal shall not materially affect the Issuer's or Guarantor's ability to make anticipated principal and interest payments on the Notes (in the good faith determination of the Board of Directors of such Obligor); or

(4)    any agreement between any Person and an Affiliate of such Person existing at the time such Person is acquired by or merged into an Obligor or a Subsidiary of any Obligor; provided that such agreement was not entered into in contemplation of such acquisition or merger, and any amendment thereto, so long as any such amendment is not disadvantageous to the Holders in the good faith judgment of the Board of Directors of the applicable Obligor, when taken as a whole, as compared to the applicable agreement as in effect on the date of such acquisition or merger; provided that such agreement or any amendment thereof shall not materially affect such Obligor's ability to make anticipated principal and interest payments on the Notes (in the good faith determination of the Board of Directors of such Obligor).

#4834-6333-0618

[FILED: NEW YORK COUNTY CLERK 02/06/2020 04:10 PM]   INDEX NO. 650854/2020
NYSCEF DOC. NO. 4                                        RECEIVED NYSCEF: 02/06/2020

Section 4.15    Repurchase Upon Event of Default

(a)    If an Event of Default occurs and is continuing, the Issuer shall redeem, in accordance with Section 6.02(b), all of the Notes at a redemption price in cash equal to 100% of the aggregate principal amount of the Notes outstanding plus accrued and unpaid interest (including additional interest to be paid following an Event of Default as set forth in Section 2.12), and interest upon overdue interest, if any (the "Event of Default Redemption Price"), to the date of redemption (the "Event of Default Redemption Payment Date"), subject to the right of Holders of record on a Record Date to receive any interest due on such Event of Default Redemption Payment Date (the redemption described in this Section 4.15(a), an "Event of Default Redemption"). For the avoidance of doubt, each of the Issuer Redemption Date, the Guarantor Redemption Date and the Clarke Redemption Date (each as defined in Section 6.02(b)) shall be deemed an Event of Default Redemption Payment Date, as applicable.

(1)    Within five Business Days following any Acceleration Effective Date, the Issuer shall mail a notice of the Acceleration Effective Date and of the Event of Default giving rise to such Acceleration Effective Date to each Holder at such Holder's registered address or otherwise deliver notice in accordance with the applicable procedures of the Depositary, with a copy to the Trustee (an "Acceleration Effective Date Notice"), stating:

(A)    the paragraph or subparagraph or Section pursuant to which such Event of Default has occurred; and

(B)    that the Notes have become immediately due and payable, subject to the extension and procedure set forth in Section 6.02(b), if applicable.

(b)    If the Issuer is obligated to deliver an Event of Default Redemption Notice pursuant to Section 6.02(b), the Issuer shall, subject to the timing set forth in Section 6.02(b), deliver such Event of Default Redemption Notice to the Trustee and to each Holder at such Holder's registered address or otherwise deliver notice in accordance with the applicable procedures of the Depositary, identifying the Notes to be redeemed (including CUSIP and ISIN number, if applicable) and stating:

(1)    the paragraph or subparagraph or Section pursuant to which an Event of Default has occurred and referring to any Acceleration Effective Date Notice previously delivered with respect to such Event of Default;

(2)    that the Notes have become immediately due and payable;

(3)    that an Event of Default Redemption is being made pursuant to this Section 4.15, and that all Notes shall be redeemed by the Issuer at a purchase price in cash equal to the Event of Default Redemption Price (subject to the right of Holders of record on the applicable Record Date to receive interest due on the Event of Default Redemption Payment Date), and setting forth the calculation of the Event of Default Redemption Price;

(4)    the Event of Default Redemption Payment Date;

#4834-6333-0618

(5)     that Notes will remain outstanding and continue to accrue interest until such time as the entire aggregate principal outstanding Notes have been redeemed;

(6)     the name and address of the Paying Agent, and that Holders shall be required to surrender such Notes to the specified Paying Agent at the specified address prior to the close of business on the Event of Default Redemption Payment Date;

(7)     that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in the Acceleration Effective Date Notice or printed on the Notes; and

(8)     the other procedures, as determined by the Issuer, consistent with this Section 4.15, that a Holder must follow.

Each of the Acceleration Effective Date Notice and the Event of Default Redemption Notice (together, each a "Section 4.15 Notice"), respectively, if mailed or otherwise delivered in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Holder receives such Section 4.15 Notice. If (A) a Section 4.15 Notice is mailed in a manner herein provided and (B) any Holder fails to receive such Section 4.15 Notice or a Holder receives such Section 4.15 Notice but it is defective, such Holder's failure to receive such Section 4.15 Notice or such defect shall not affect the validity of the proceedings for the purchase of the Notes as to all other Holders that properly received such Section 4.15 Notice without defect.

(c)     No later than 11:00 a.m. (New York City time) on the Business Day prior to the Event of Default Redemption Payment Date, the Issuer shall, to the extent lawful, deposit with the Paying Agent an amount equal to the Event of Default Redemption Price in respect of all Notes. The Trustee or Paying Agent shall promptly return to the Issuer any cash in U.S. dollars, deposited with the Trustee or Paying Agent, as applicable, by the Issuer in excess of the amounts necessary to pay the Event of Default Redemption Price on all Notes to be redeemed.

(d)     On the Event of Default Redemption Payment Date, the Issuer shall, to the extent lawful, deliver or cause to be delivered to the Trustee for cancellation all Notes together with an Officers' Certificate stating the aggregate principal amount of Notes purchased by the Issuer in accordance with this Section 4.15 represents the total aggregate principal amount of Notes outstanding.

(e)     The Paying Agent shall promptly pay (or otherwise deliver in accordance with the applicable procedures of the Depositary) to each Holder of Notes the Event of Default Redemption Price for such Notes.

(f)     If the Event of Default Redemption Payment Date is on or after a Record Date and on or before the related Payment Date, any accrued and unpaid interest to the Event of Default Redemption Payment Date shall be paid on the Event of Default Redemption Payment Date to the Person in whose name a Note is registered at the close of business on such Record Date.

(g)     The Issuer shall not be required to make an Event of Default Redemption

-50-

upon an Event of Default if a third party consummates the Event of Default Redemption in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.15 applicable to an Event of Default Redemption made by the Issuer and purchases all Notes.

(h)     If the Issuer complies with the provisions of Section 4.15, on and after the Event of Default Redemption Payment Date, interest shall cease to accrue on all redeemed Notes. If any Note called for redemption by an Acceleration Effective Date Notice shall not be so paid upon surrender for redemption because of the failure of the Issuer to comply with Section 4.15(b), interest shall be paid on the unpaid principal, from the Event of Default Redemption Payment Date until such principal is paid, and, to the extent lawful, on any interest accrued to the Event of Default Redemption Payment Date not paid on such unpaid principal, in each case at the rate provided in the Notes and in Sections 2.12 and Section 4.01.

Section 4.16    Issuer Notice of Default Under Progress Note

If the Issuer determines it is in breach of Section 6.01(a)(7) with respect to the Progress Lease and/or Progress Note, then the Issuer shall within one Business Day following such determination furnish an Officers' Certificate to the Trustee certifying that the Issuer is in breach of Section 6.01(a)(7). Upon receipt of such Officer's Certificate, the Trustee shall furnish a copy thereof to the Holders in accordance with the applicable procedures of the Depositary.

ARTICLE 5

SUCCESSORS

Section 5.01    Merger, Consolidation or Sale of Assets.

No Obligor shall, or shall permit any of its Subsidiaries to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) (x) all or any substantial part of its assets, or (y) all or substantially all of the Capital Stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except that

(1)     in the case of any sale, transfer, lease or other disposition of assets which is not a substantial part of its assets, the net cash proceeds from such transaction are equal or greater than the depreciated value of such asset and such net proceeds, within five (5) Business Days after receipt shall be either deposited in a segregated account to be used for the payment of Amortization Amounts or to purchase replacement assets which are useful in the business; and

(2)     a merger or combination shall be permitted so long as, after giving effect thereto: (i) the value of the Collateral securing the Obligations and the Note Guarantees by the Guarantors of the Obligations are not materially reduced, (ii) the Liens in favor of Trustee or the Collateral Agent, as applicable, for the benefit of the Holders under the Notes Documents are not materially impaired, (iii) there is no material and adverse effect on the material rights and remedies of the Trustee, the Collateral Agent and/or the Holders under any Notes Document, including the legality, validity, binding effect or

-51-

enforceability of any Notes Document, (v) immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing and (vi) if the Obligor or the applicable Subsidiary is not the entity surviving such merger or combination (any such Person, the "Successor Company"), then the Successor Company shall be an entity organized or existing under the laws of the United States of America, any State or territory thereof, the District of Columbia, any member state of the European Union on January 1, 2004 (other than Greece), Canada or any province of Canada, Norway, Switzerland, Guernsey or Jersey and shall expressly assume all of the Obligations of its predecessor under this Indenture and any other obligations under the other Notes Document, including the obligation to pay Additional Amounts with respect to any jurisdiction in which it is organized or resident for tax purposes or through which it makes payments, and such Obligor shall, or cause such Subsidiary to, have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger, winding up or disposition, and such supplemental indenture, if any, comply with this Indenture.

ARTICLE 6

DEFAULTS AND REMEDIES

Section 6.01   Events of Default.

(a)       Each of the following is an "Event of Default":

(1)       default in any payment of interest (including Additional Amounts) or an Amortization Amount on any Note when due, continued for three (3) days;

(2)       default in the payment of principal or premium, if any, on any Note when due;

(3)       failure by the Issuer or any Guarantor to comply with its obligations under Section 5.01;

(4)       failure by the Issuer or any Guarantor to comply for 30 days after notice as provided below with any of its obligations under Article 4 (other than Sections 4.08, 4.09, 4.10, 4.12, 4.13, 4.14 and 4.15) and Article 5 (in each case, other than (A) a failure to purchase Notes which constitutes an Event of Default under Section 6.01(a)(2), (B) a failure to comply with Section 4.16 for a period of three days, (C) a failure to comply with Section 5.01 which constitutes an Event of Default under Section 6.01(a)(3) or (D) a failure to comply with Section 9.07, which constitutes an Event of Default under Section 6.01(a)(6));

(5)       failure by an Obligor or any of its Subsidiaries to comply with its obligations under Sections 4.08, 4.09, 4.10, 4.12, 4.13, 4.14 and 4.15;

(6)       failure by the Issuer or any Guarantor to comply for 60 days after notice as provided below with its other agreements contained in this Indenture, the Notes, the Note Guarantees and the Collateral Documents;

-52-

(7)     (i) default under any mortgage, indenture or instrument under which there is issued or by which there is secured or evidenced any Indebtedness for money borrowed by any Obligor or any of its Subsidiaries (or the payment of which is Guaranteed by any Obligor or any of its Subsidiaries), other than Indebtedness owed to any Obligor or any of its Subsidiaries, whether such Indebtedness or Guarantee now exists or is created after the Issue Date, which default:

(A)     is caused by a failure to pay principal of, or interest or premium, if any, on such Indebtedness prior to the expiration of the grace period provided in such Indebtedness; or

(B)     results in the acceleration of such Indebtedness prior to its maturity;

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a payment default or the maturity of which has been so accelerated, aggregates $2.5 million or more or, (ii) with respect to the Progress Lease and the Progress Note upon the earlier of (x) the expiration of any applicable grace period with respect to a missed payment under the Progress Lease or default under the Progress Note caused by a failure to pay principal of, or interest or premium, if any, on the Progress Lease or the Progress Note prior to the expiration of the grace period provided in the Progress Lease or the Progress Note, in an amount not less than $300,000, *provided however* that such grace period shall be extended a further sixty (60) days if at the expiration of such original grace period the parties continue to negotiate in good faith towards a resolution with respect to such missed payment (such good-faith negotiations to be evidenced by an Officers' Certificate furnished by the Issuer to the Trustee at least two Business Days prior to the expiration of the applicable grace period, certifying that the Issuer is engaged in good-faith negotiations with Progress and any other applicable parties to the Progress Lease), and such sixty (60)-day extension of the original grace period shall terminate upon termination of such negotiations, and *provided further* that such sixty (60)-day grace period extension shall be further extended until any limited waiver period, forbearance period or similar contractual stay of exercise of remedies agreed in writing between the Issuer and Progress based upon such payment default expires leaving the Issuer in payment default under the Progress Lease or the Progress Note, and (y) the acceleration of the maturity of not less than $300,000 of any obligations owed under the Progress Lease or Progress Note;

(8)     failure by any Obligor or any of its Subsidiaries to pay final judgments aggregating in excess of $5.0 million (net of any amounts that a reputable and creditworthy insurance company has acknowledged liability for in writing), which judgments are not paid, discharged or stayed for a period of 60 days or more after such judgment becomes final;

(9)     (i) any Obligor or any of its Subsidiaries, pursuant to or within the meaning of the Bankruptcy Law:

-53-

#4834-6333-0618

(A)     commences proceedings to be adjudicated bankrupt or insolvent;

(B)     consents to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law;

(C)     consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or substantially all of its property;

(D)     makes a general assignment for the benefit of its creditors;

(E)     is unable or admits in writing its inability to pay its debts as they mature;

(F)     generally is not paying its debts as they become due;

(ii)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A)     is for relief against any Obligor or any of its Subsidiaries in a proceeding in which any such Obligor or any such Subsidiary is to be adjudicated bankrupt or insolvent;

(B)     appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of any Obligor or any of their Subsidiaries, or for all or substantially all of the property of any Obligor or any of its Subsidiaries; or

(C)     orders the liquidation, dissolution or winding up of any Obligor or any of its Subsidiaries;

and the order or decree remains unstayed and in effect for 60 consecutive days;

(10)     any Note Guarantee or Collateral Document ceases to be in full force and effect (except as contemplated by the terms of this Indenture) or is declared null and void in a judicial proceeding or any Guarantor or the Issuer denies or disaffirms its obligations under this Indenture, its Note Guarantee or the Collateral Documents, or contests the validity or enforceability of any part of this Indenture or any other Notes Document;

(11)     the occurrence of a Change of Control other than a Permitted Change of Control;

(12)     this Indenture or any other Notes Document shall for any reason cease to create, or any Lien purported to be created by such Notes Document shall be asserted in writing by the Issuer or any Guarantor not to be, a valid and perfected first priority Lien on and security interest in any portion of the Collateral purported to be covered thereby,

-54-

other than Liens explicitly permitted hereunder; or with respect to any Collateral having a fair market value in excess of $2.5 million, individually or in the aggregate, (A) the failure of the security interest with respect to such Collateral under the Collateral Documents, at any time, to be in full force and effect for any reason other than in accordance with their terms and the terms of this Indenture, which failure continues for 60 days or (B) the assertion by the Issuer or any Guarantor, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable; or

(13)   (i) Any Clarke Guarantor is criminally indicted or convicted of a felony, (ii) the death of Thomas Matthew Clarke or (iii) a conservator shall have been appointed to oversee the affairs of Thomas Matthew Clarke;

*provided, however*, that a Default under clauses (4) and (6) of this Section 6.01(a) shall not constitute an Event of Default until the Trustee notifies the Issuer or the Holders of at least 25% in principal amount of the then outstanding Notes notify the Issuer and the Trustee of the Default and the Issuer does not cure such Default within the time specified in clauses (4) and (6) of this Section 6.01(a) after receipt of such notice.

Section 6.02   Acceleration.

(a)   (1)   If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of outstanding Notes by written notice to the Issuer (and the Trustee, if given by the Holders) may declare the principal of, premium and Additional Amounts, if any, and accrued and unpaid interest, if any, on all the Notes to be due and payable and upon such declaration, shall be due and payable immediately.

(2)   If an Event of Default under clauses (1), (2) or (9) of Section 6.01(a) occurs and is continuing, the principal, premium, if any, and accrued and unpaid interest, if any, on all the Notes shall become and be immediately due and payable, without any declaration or other act on the part of the Trustee or any Holders (such date in the case of this paragraph and the paragraph above, the "Acceleration Effective Date").

(b)   Notwithstanding Section 6.02(a), if on or after an Acceleration Effective Date arising out of an Event of Default other than a Specified Event of Default the Issuer delivers to the Trustee an Officer's Certificate certifying that the Issuer does not have sufficient cash and Cash Equivalents to pay all amounts then due and owing to the Holders on the Notes, including the Event of Default Redemption Price, then the Issuer, the Coke Guarantor and the Clarke Guarantors shall not be permitted to make any payments to the Mechanics Lienholders, and:

(1)   the Issuer shall have 180 days (a "Standstill Period") from and including the Acceleration Effective Date (such 180th day, the "First Standstill Expiration Date") to sell, transfer, lease or otherwise dispose of sufficient assets to pay the Event of Default Redemption Price; *provided* that if during such Standstill Period the Issuer uses commercially reasonable efforts to sell, transfer, lease or otherwise dispose of assets to pay the Event of Default Redemption Price, none of the Trustee, the Collateral Agent or any Holder shall be permitted to take any enforcement action against the Collateral, and

#4834-6333-0618

at no time thereafter prior to the last day for the Issuer to deliver an Issuer Redemption Failure Notice, may any of the Trustee, Collateral Agent or any Holder take an enforcement action or pursue any other remedy against the Issuer, the Coke Guarantor, the Clarke Guarantors or the Collateral.

(A)  If, on or prior to the First Standstill Expiration Date, the Issuer determines it shall not have sufficient cash and Cash Equivalents to pay the Event of Default Redemption Price on the date falling five Business Days after the First Standstill Expiration Date (the "Issuer Redemption Date"), then the Issuer shall immediately, and no later than four Business Days prior to the Issuer Redemption Date, furnish an Officers' Certificate to the Trustee certifying that the Issuer is unable to redeem the Notes in full pursuant to Section 4.15. Upon receipt of such Officer's Certificate, the Trustee shall furnish a copy thereof to the Holders in accordance with the applicable procedures of the Depositary (an "Issuer Redemption Failure Notice").

(B)  If at any time, and from time to time, prior to the First Standstill Expiration Date, the Issuer has sufficient cash and Cash Equivalents to redeem, pursuant to Section 4.15, no less than $2.0 million aggregate principal amount of Notes outstanding, then the Issuer shall promptly deposit with the Trustee an amount of cash equal to the Event of Default Redemption Price for the maximum aggregate principal amount of the Notes for which the Issuer has sufficient cash or Cash Equivalents, and shall redeem such Notes pursuant to Sections 4.15 and 6.13.

(2)  Upon the delivery of an Issuer Redemption Failure Notice, the Coke Guarantor shall have a Standstill Period, from and including the date of such notice (the last day of such Standstill Period, the "Second Standstill Expiration Date"), to sell, transfer, lease or otherwise dispose of the Coke Collateral, or such other assets as it determines, to pay any outstanding unpaid amount of the Event of Default Redemption Price (including defaulted interest pursuant to Section 2.12) (the "Deficiency Amount"); *provided* that if during such Standstill Period the Coke Guarantor uses commercially reasonable efforts to sell, transfer, lease or otherwise dispose of the Coke Collateral, or such other assets as it determines, to pay the Deficiency Amount, none of the Trustee, the Collateral Agent or any Holder shall be permitted to take an enforcement action against the Coke Collateral, and at no time thereafter prior to the last day for the Coke Guarantor to deliver a Coke Redemption Failure Notice, may any of the Trustee, Collateral Agent or any Holder take an enforcement action or pursue any other remedy against the Coke Guarantor or the Clarke Guarantors or the Coke Collateral.

(A)  If, on or prior to the Second Standstill Expiration Date, the Coke Guarantor determines it shall not have sufficient cash and Cash Equivalents to pay the Deficiency Amount on the date falling five Business Days after the Guarantor Notice Expiration Date (the "Guarantor Redemption Date"), then the Issuer shall promptly, and no later than four Business Days prior to the Guarantor Redemption Date, furnish an Officer's Certificate to the Trustee certifying that the Issuer is unable to redeem the Notes pursuant to Section 4.15. Upon receipt of

#4834-6333-0618

such Officer's Certificate, the Trustee shall furnish a copy thereof to the Holders in accordance with the applicable procedures of the Depositary (a "<u>Guarantor Redemption Failure Notice</u>").

(B)     If at any time, and from time to time, prior to the Second Standstill Expiration Date, the Coke Guarantor has sufficient cash and Cash Equivalents to redeem, pursuant to Section 4.15, no less than $2.0 million aggregate principal amount of Notes at the Event of Default Redemption Price, then the Coke Guarantor shall promptly deposit with the Trustee an amount of cash equal to the Event of Default Redemption Price for the maximum aggregate principal amount of the Notes for which the Issuer has sufficient cash or Cash Equivalents into the Collateral Account and shall redeem such Notes pursuant to Sections 4.15 and 6.13.

(3)     Upon the delivery of a Guarantor Redemption Failure Notice, the Clarke Guarantors shall have a Standstill Period, from and including the date of such notice (the last day of such Standstill Period, the "<u>Third Standstill Expiration Date</u>" and, together with the First Standstill Expiration Date and the Second Standstill Expiration Date, each an "<u>Expiration Date</u>"), to sell, transfer, lease or otherwise dispose of assets to pay the Deficiency Amount; *provided* that if during such Standstill Period the Clarke Guarantors use commercially reasonable efforts to sell, transfer, lease or otherwise dispose of assets to pay the Deficiency Amount, prior to the last day for the Clarke Guarantors to deliver a Clarke Redemption Failure Notice none of the Trustee, Collateral Agent or any Holder may take an enforcement action or pursue any other remedy against the Clarke Guarantors.

(A)     If on or prior to the Third Standstill Expiration Date, the Clarke Guarantors determine they shall not have sufficient cash and Cash Equivalents necessary to pay the Deficiency Amount on the date falling five Business Days after the Third Standstill Expiration Date (the "<u>Clarke Redemption Date</u>"), then the Issuer shall promptly, and no later than four Business Days prior to the Clarke Redemption Date, furnish an Officer's Certificate to the Trustee certifying that the Issuer is unable to redeem the Notes pursuant to Section 4.15. Upon receipt of such Officer's Certificate, the Trustee shall furnish a copy thereof to the Holders in accordance with the applicable procedures of the Depositary (a "<u>Clarke Redemption Failure Notice</u>" and, together with the Issuer Redemption Failure Notice and the Guarantor Redemption Failure Notice, each a "<u>Redemption Failure Notice</u>") and furnish notice of such in accordance with the applicable procedures of the Depositary, with a copy to the Trustee, upon receipt of which the Trustee may pursue any remedy pursuant to Section 6.03.

(B)     If at any time, and from time to time, prior to the Third Standstill Expiration Date, the Clarke Guarantors have sufficient cash and Cash Equivalents to redeem, pursuant to Section 4.15, no less than $2.0 million aggregate principal amount of Notes at the Event of Default Redemption Price, then the Clarke Guarantors shall promptly deposit with the Trustee an amount of cash equal to the Event of Default Redemption Price for the maximum aggregate principal amount

-57-

#4834-6333-0618

of the Notes for which the Issuer has sufficient cash or Cash Equivalents and shall redeem such Notes pursuant to Sections 4.15 and 6.13.

For purposes of Section 6.02(b)(1)(B), 6.02(b)(2)(B) and 6.02(b)(3)(B), the Issuer, the Coke Guarantor and the Clarke Guarantors shall provide the Trustee with their cash and Cash Equivalents on each Interest Payment Date following an Event of Default.

(c)     If an Event of Default under Section 6.01(a)(9) occurs and is continuing, the Standstill Period for the entity subject of such Event of Default shall end and the Standstill Period for the next entity pursuant to Section 6.02(b) shall begin.

(d)     If, at any time, (x) a Specified Event of Default has occurred and is continuing or (y) any Deficiency Amount remains outstanding following the Third Standstill Expiration Date, then the Trustee and the Holders may pursue any available remedy to collect the payment of principal, premium, if any, and interest due on the Notes, or to enforce the performance of any provision of the Notes or this Indenture.

(e)     The Holders of a majority in principal amount of the outstanding Notes may waive all past Events of Default (except with respect to nonpayment of principal, premium or interest) and rescind any acceleration with respect to the Notes and its consequences if (1) such rescission would not conflict with any judgment or decree of a court of competent jurisdiction, (2) all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by such declaration of acceleration, have been cured or waived and (3) there has been deposited with the Trustee a sum sufficient to pay its fees, expenses and indemnities in connection with such Event of Default, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel and all other amounts payable to the Trustee under Section 7.07.

(f)     For the avoidance of doubt, following an Event of Default, and until such Event of Default is cured or all amounts due and outstanding under this Indenture have been paid, the Issuer shall not be permitted to pay any interest as PIK Interest.

(g)     If the Trustee has not received (x) an Acceleration Effective Date Notice within five Business Days following an Acceleration Effective Date or (y) a Redemption Failure Notice within ten Business Days following any Notice Expiration Date, the Trustee, the Collateral Agent and the Holders may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

(h)     Notwithstanding Section 6.02(b), if upon acceleration of the Notes any Obligor or Clarke Guarantor shall make any payment to the Mechanics Lienholders, pursuant to the Mechanics Lien Royalty Agreements, then Section 6.02(b) shall be of no force and effect and the Trustee and the Holders may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

(i)     All proceeds from any sale, transfer, lease or disposition of assets pursuant to Section 6.02(b) shall be deposited no later than ten Business Days after receipt

#4834-6333-0618

thereof into the Collateral Account for application in accordance with Sections 4.15, 6.02(b) and Section 6.13 (and subject to Section 10.08). If the Issuer or any Guarantor fails to deposit such proceeds within five Business Days, then Section 6.02(b) shall be of no force and effect and the Trustee and the Holders may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

Section 6.03    Other Remedies.

(a)    If a Specified Event of Default has occurred and is continuing, or if at any time following an Event of Default any Deficiency Amount has not been fully-paid to the Trustee or the Collateral Agent by the Issuer or any of the Guarantors, then the Trustee and the Holders may, subject to Section 6.02(b), pursue any available remedy to collect such Deficiency Amount.

(b)    The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  All remedies are cumulative to the extent permitted by law.

Section 6.04    Waiver of Past Defaults.

The Holders of a majority in principal amount of the outstanding Notes by written notice to the Trustee may on behalf of all Holders waive any existing Default and its consequences hereunder, except:

(1)    a continuing Default in the payment of the principal, premium, if any, or interest on any Note held by a non-consenting Holder; and

(2)    a Default with respect to a provision that under Section 9.02 cannot be amended without the consent of each Holder affected,

*provided* that, subject to Section 6.02, the Holders of a majority in principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration.  Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05    Control by Majority.

The Holders of a majority in principal amount of the outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or the Collateral Agent of exercising any trust or power conferred on the Trustee or the Collateral Agent.  However, the Trustee and the Collateral Agent, as the case may be, may refuse to follow any direction that conflicts with law, this Indenture, the Notes, any Note Guarantee or the Collateral Documents, or that the Trustee or the Collateral Agent determines in good faith is

#4834-6333-0618

Case 1:20-cv-02043-LJL   Document 1-2   Filed 03/06/20   Page 77 of 114

unduly prejudicial to the rights of any other Holder or that would involve the Trustee or the Collateral Agent in personal liability.

Section 6.06    Limitation on Suits.

Subject to Section 6.07, no Holder may pursue any remedy with respect to this Indenture or the Notes unless:

(1)    such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(2)    the Holders of at least 25% in principal amount of the then outstanding Notes have requested the Trustee to pursue the remedy;

(3)    such Holders have offered the Trustee security or indemnity reasonably satisfactory to the Trustee against any loss, liability or expense;

(4)    the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity; and

(5)    the Holders of a majority in principal amount of the then outstanding Notes have not given the Trustee a direction that, in the opinion of the Trustee, is inconsistent with such request within such 60-day period.

A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are prejudicial to such Holders).

Section 6.07    Rights of Holders to Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal, premium, if any, and interest on its Note, on or after the respective due dates expressed or provided for in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

Section 6.08    Collection Suit by Trustee.

If an Event of Default specified in Section 6.01(a)(1) or (2) occurs and is continuing, subject to Section 6.02(b), the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer and any other obligor on the Notes for the whole amount of principal, premium, if any, and interest remaining unpaid on the Notes, together with interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel.

Section 6.09    Restoration of Rights and Remedies.

#4834-6333-0618

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceedings, the Issuer, the Guarantors, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding has been instituted.

Section 6.10    Rights and Remedies Cumulative.

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 2.07, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy are, to the extent permitted by law, cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 6.11    Delay or Omission Not Waiver.

No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

Section 6.12    Trustee May File Proofs of Claim.

The Trustee may file proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Issuer (or any other obligor upon the Notes, including the Guarantors), its creditors or its property and is entitled and empowered to participate as a member in any official committee of creditors appointed in such matter and to collect, receive and distribute any money or other property payable or deliverable on any such claims.  Any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel, and any other amounts due the Trustee or the Collateral Agent under Section 7.07.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee or the Collateral Agent under Section 7.07 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation

-61-

#4834-6333-0618

or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.13    Priorities.

(a)    Application of Proceeds. If an Event of Default shall have occurred and be continuing, the Trustee or Paying Agent, as applicable, shall apply all or any part of proceeds constituting Collateral, any proceeds of the Guarantee set forth in Article 11 and any proceeds of the Clarke Guaranty, in payment of the Obligations in the following order:

(1)    to pay incurred and unpaid fees, expenses and indemnities of the Trustee and/or each Agent under the Notes Documents, including all amounts due under Section 7.07;

(2)    Second, to the Trustee and/or Paying Agent, for application by it towards payment of amounts then due and owing and remaining unpaid in respect of the Obligations to the Holders, *pro rata* among the Holders according to the amounts of the Obligations then due and owing and remaining unpaid to the Holders;

(3)    Third, to the Trustee and/or Paying Agent, for application by it towards prepayment of the Obligations, *pro rata* among the Holders according to the amounts of the Obligations then held by the Holders; and

(4)    Fourth, any balance remaining after the Obligations shall have been paid in full shall be paid over to or at the direction of the Issuer or as a court of competent jurisdiction may otherwise direct.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.13. Promptly after any record date is set pursuant to this Section 6.13, the Trustee shall cause notice of such record date and payment date to be given to the Issuer and to each Holder in the manner set forth in Section 13.01.

Section 6.14    Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in such suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.14 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07, or a suit by Holders of more than 10% in aggregate principal amount of the outstanding Notes.

ARTICLE 7

TRUSTEE

Section 7.01   Duties of Trustee.

(a)     If an Event of Default has occurred and is continuing of which a Responsible Officer of the Trustee has received written notice, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)     Except during the continuance of an Event of Default of which a Responsible Officer of the Trustee has received written notice:

(1)     the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  However, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)     The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)     this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(2)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved in a court of competent jurisdiction that the Trustee was negligent in ascertaining the pertinent facts; and

(3)     the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

(d)     Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to the provisions of this Section 7.01.

(e)     The Trustee shall be under no obligation to exercise any of the rights or powers under this Indenture, Collateral Documents, the Notes and the Note Guarantees at the

-63-

#4834-6333-0618

request or direction of any of the Holders or expend or risk its own funds or otherwise incur financial liability in the performance of its duties hereunder or under any of the Notes Documents unless such Holders have offered to the Trustee indemnity or security reasonably satisfactory to it against any loss, liability or expense.

(f)     The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.02    Rights of Trustee.

Subject to Section 7.01:

(a)     The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee need not investigate any fact or matter stated in the document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine in good faith to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(b)     Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both subject to the other provisions of this Indenture. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel.  The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)     The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with due care.

(d)     The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)     Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer or a Guarantor shall be sufficient if signed by an Officer of the Issuer or such Guarantor.

(f)     None of the provisions of this Indenture shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity reasonably satisfactory to it against such risk or liability is not assured to it.

(g)     The Trustee shall not be deemed to have notice or knowledge of any

#4834-6333-0618

Case 1:20-cv-02043-LJL Document 1-2 Filed 03/06/20 Page 82 of 114

INDEX NO. 650854/2020
RECEIVED NYSCEF: 02/06/2020

Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the existence of a Default or Event of Default, the Notes and this Indenture.

(h)     In no event shall the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(j)     The Trustee may request that the Issuer deliver an Officers' Certificate setting forth the names of individuals or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(k)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(l)     The Trustee shall have no duty (A) to see to any recording, filing, or depositing of this Indenture or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any rerecording, refiling or redepositing of any thereof, (B) to see to any insurance or (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any Lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the trust fund.

(m)     Except as otherwise expressly provided herein, the rights, privileges, protections, exculpations, immunities, indemnities and benefits provided to the Trustee hereunder (including but not limited to its right to be indemnified) are extended to, and shall be enforceable by, the Trustee and to its Responsible Officers and other Persons duly employed by them hereunder as if they were each expressly set forth herein for the benefit of the Trustee in such capacity, Responsible Officers or employees of the Trustee mutatis mutandis.

(n)     The Trustee may request that an Issuer deliver an Officers' Certificate setting forth the names of the individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(o)     Anything in this Indenture notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit), even if the Trustee has been advised as to the

#4834-6333-0618

Case 1:20-cv-02043-LJL   Document 1-2   Filed 03/06/20   Page 83 of 114

likelihood of such loss or damage and regardless of the form of action.

(p)  The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its control, including, without limitation, any provision of any law or regulation or any act of any governmental authority; natural catastrophes or other acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.

(q)  The permissive right of the Trustee to take any action under this Indenture or under any other agreement in connection herewith shall not be construed as a duty.

Section 7.03   Individual Rights of Trustee.

The Trustee or any Agent in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Affiliate of the Issuer with the same rights it would have if it were not Trustee or such Agent.  Any Agent may do the same with like rights and duties.  The Trustee is also subject to Section 7.10.

Section 7.04   Trustee's Disclaimer.

The recitals contained herein and in the Notes, except for the Trustee's certificates of authentication, shall be taken as the statements of the Issuer, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representations as to the validity, sufficiency or adequacy of this Indenture, of the Notes or of the Note Guarantees, or of any other Notes Document except that the Trustee represents that it is duly authorized to execute and deliver this Indenture, authenticate the Notes and perform its obligations hereunder.  The Trustee shall not be accountable for the use or application by the Issuer of Notes or the proceeds thereof. The Trustee shall not be responsible to make any calculation with respect to any matter under this Indenture.  It shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it shall not be responsible for any statement or recital herein or any statement in the Notes or the Note Guarantees or any other document in connection with the issuance or sale of the Notes or pursuant to this Indenture other than its certificate of authentication.  The Trustee shall have no duty to monitor or investigate the Issuer's compliance with or the breach of, or cause to be performed or observed, any representation, warranty or covenant made in this Indenture or any Security Document.

Section 7.05   Notice of Defaults.

If a Default occurs and is continuing of which a Responsible Officer of the Trustee has received written notice, the Trustee shall send electronically or mail to each Holder a notice of the Default within 90 days after it has received such written notice.  Except in the case of an Event of Default specified in clauses (1) or (2) of Section 6.01(a), the Trustee may withhold from the Holders notice of any continuing Default if the Trustee determines in good faith that withholding the notice is in the interest of the Holders.

#4834-6333-0618

Section 7.06    Reports by Trustee to Holders of the Notes.

The Issuer shall promptly notify the Trustee in writing in the event the Notes are listed on any national securities exchange or delisted therefrom.

Section 7.07    Compensation and Indemnity.

(a)    The Issuer and the Guarantors, jointly and severally, shall pay to the Trustee, in its capacity as Trustee and as an Agent, from time to time such compensation for its acceptance of this Indenture and services hereunder and under each other Notes Document as the parties shall agree in writing from time to time. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it, in its capacity as Trustee and as an Agent, in addition to the compensation for its services. Such expenses shall include the reasonable compensation, disbursements and expenses of the respective agents and counsel of the Trustee and the Collateral Agent.

(b)    The Issuer and the Guarantors, jointly and severally, shall indemnify the Trustee, in its capacity as Trustee and as an Agent, for, and hold the Trustee and any predecessor harmless against, any and all loss, damage, claims, liability or expense (including attorneys' fees and expenses) incurred by it in connection with the acceptance or administration of this trust and the performance of its duties hereunder (including the costs and expenses of enforcing this Indenture against the Issuer or any Guarantor (including this Section 7.07)) or defending itself against any claim whether asserted by any Holder, the Issuer or any Guarantor, or liability in connection with the acceptance, exercise or performance of any of its powers or duties hereunder). The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder. The Issuer shall defend the claim and the Trustee may have separate counsel and the Issuer shall pay the fees and expenses of such counsel. The Issuer need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee, in its capacity as Trustee and as an Agent, through the Trustee's own willful misconduct, gross negligence or bad faith.

(c)    The obligations of the Issuer and the Guarantors under this Section 7.07 shall survive the satisfaction and discharge of this Indenture or the earlier resignation or removal of the Trustee, in its capacity as Trustee and as an Agent, as the case may be.

(d)    To secure the payment obligations of the Issuer and the Guarantors in this Section 7.07, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee, in its capacity as Trustee and as an Agent, as the case may be, except that held in trust to pay principal and interest on particular Notes. Such Lien shall survive the satisfaction and discharge of this Indenture or the earlier resignation or removal of the Trustee, in its capacity as Trustee and as an Agent, as the case may be.

(e)    When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(a)(9) occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute

-67-

Case 1:20-cv-02043-LJL   Document 1-2   Filed 03/06/20   Page 85 of 114

expenses of administration under any Bankruptcy Law.

Section 7.08    Replacement of Trustee.

(a)    A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.  The Trustee may resign in writing at any time by giving 30 days prior notice of such resignation to the Issuer and be discharged from the trust hereby created by so notifying the Issuer.  The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuer in writing. The Issuer may remove the Trustee if:

(1)    the Trustee fails to comply with Section 7.10;

(2)    the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(3)    a receiver or public officer takes charge of the Trustee or its property; or

(4)    the Trustee becomes incapable of acting.

(b)    If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuer shall promptly appoint a successor Trustee.  Within one year after the successor Trustee takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the successor Trustee to replace it with another successor Trustee.

(c)    If a successor Trustee does not take office within 45 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the Issuer's expense), the Issuer or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(d)    If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)    A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer.  Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee shall mail a notice of its succession to Holders.  The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; *provided* that all sums owing to the Trustee hereunder have been paid and such transfer shall be subject to the Lien provided for in Section 7.07. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Issuer's Obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

(f)    As used in this Section 7.08, the term "Trustee" shall also include each Agent.

-68-

Section 7.09    Successor Trustee by Merger, etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation or national banking association, the successor corporation or national banking association without any further act shall be the successor Trustee, subject to Section 7.10.

Section 7.10    Eligibility; Disqualification.

(a)    There shall at all times be a Trustee hereunder that is a corporation or national banking association organized and doing business under the laws of the United States or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $50.0 million as set forth in its most recent published annual report of condition.

(b)    This Indenture shall always have a Trustee who satisfies the requirements of Trust Indenture Act Sections 310(a)(1), (2) and (5). The Trustee is subject to Trust Indenture Act Section 310(b).

## ARTICLE 8

## [RESERVED]

## ARTICLE 9

## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    Without Consent of Holders.

(a)    Notwithstanding Section 9.02, without the consent of any Holder, the Issuer, the Guarantors and the Trustee may amend this Indenture, the Notes, the Note Guarantees and each other Notes Document to:

(1)    cure any ambiguity, omission, defect or inconsistency;

(2)    provide for the assumption by a successor entity of the Obligations of the Issuer or any Guarantor under this Indenture, the Note Guarantees and the other Notes Documents in accordance with Article 5;

(3)    provide for or facilitate the issuance of uncertificated Notes in addition to or in place of certificated Notes; *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code;

(4)    comply with the rules of any applicable depositary;

(5)    add Guarantors with respect to the Notes or release a Guarantor from its

-69-

#4834-6333-0618

Obligations under its Note Guarantee or this Indenture in accordance with the applicable provisions of this Indenture;

(6)     add covenants of the Issuer, any other Obligor, and any of its or their Subsidiaries or Events of Default for the benefit of Holders or to make changes that would provide additional rights to the Holders or to surrender any right or power conferred upon any Obligor;

(7)     make any change that does not materially adversely affect the legal rights under this Indenture, the Notes or any other Notes Document of any Holder;

(8)     evidence and provide for the acceptance of an appointment under this Indenture of a successor trustee or collateral agent; *provided* that the successor trustee or collateral agent is otherwise qualified and eligible to act as such under the terms of this Indenture;

(9)     confirm and evidence the release, termination or discharge of any Lien with respect to or securing the Notes or the Note Guarantees when such release, termination or discharge is provided for in accordance with the terms of this Indenture or the Collateral Documents;

(10)     to comply with requirements of the SEC in order to effect or maintain the qualification of this Indenture under the Trust Indenture Act;

(11)     make any amendment to the provisions of this Indenture relating to the transfer and legending of Notes as permitted by this Indenture, including, without limitation, to facilitate the issuance and administration of the Notes; *provided, however,* that (A) compliance with this Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any applicable securities law and (B) such amendment does not materially and adversely affect the rights of Holders to transfer Notes.

(b)     Upon the request of the Issuer, and upon receipt by the Trustee of the documents described in Section 13.02, the Trustee shall join with the Issuer and the Guarantors in the execution of any amended or supplemental indenture or other Notes Document authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into such amended or supplemental indenture or other Notes Document that affects its own rights, duties or immunities in any capacity under this Indenture or otherwise.  Notwithstanding the foregoing, no Opinion of Counsel shall be required in connection with the addition of a Guarantor under this Indenture upon execution and delivery by such Guarantor, the Trustee of a supplemental indenture to this Indenture, the form of which is attached as <u>Exhibit C</u>, and delivery of an Officers' Certificate.

(c)     The Trustee shall, pursuant to Sections 2.1 or 9 of the Subordination Agreement, execute and deliver to Senior Creditor and the Borrower (for purposes of this clause (c), each as defined in the Subordination Agreement), at the written request of the Senior Creditor, any and all agreements, certificates, documents, or instruments as shall be necessary or

#4834-6333-0618

Case 1:20-cv-02043-LJL   Document 1-2   Filed 03/06/20   Page 88 of 114

appropriate to effect the purposes of the Subordination Agreement, including, without limitation, any amendment to the Subordination Agreement in connection with the issuance of a letter of credit to reduce amounts owed by the Issuer to such Senior Claimholder (for purposes of this clause (c), as defined in the Subordination Agreement) or otherwise, in each case without the consent or approval of the Issuer, any Guarantor or any Holder, *provided* that with respect to any such execution and delivery, the Trustee shall be entitled to an Officers' Certificate and an Opinion of Counsel, each stating that the execution and delivery of each such agreement, certificate, document, or instrument, including any amendment to the Subordination Agreement, (i) is authorized or permitted by this Indenture (and the Subordination Agreement, as applicable), (ii) is not materially adverse to any Holder or, taken as a whole, the Holders and (iii) that all conditions precedent provided for in this Indenture and the Subordination Agreement relating to such agreements, certificates, documents, or instruments, or any amendments to the foregoing or the Subordination Agreement, have been complied with, and the Trustee shall not be responsible or liable to the Issuer, any Guarantor or any Holder in connection therewith or for any matter arising out thereof.

Section 9.02    With Consent of Holders.

(a)    Except as provided in Section 9.01 and this Section 9.02, the Issuer, the Guarantors and the Trustee may amend or supplement this Indenture, the Notes, the Note Guarantees and each other Notes Document with the consent of the Holders of a majority in principal amount of the Notes then outstanding voting as a single class (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes) and, subject to Section 6.04 and Section 6.07, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal, premium, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture, the Notes, the Note Guarantees or any other Notes Document may be waived with the consent of the Holders of a majority in principal amount of the Notes then outstanding voting as a single class (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes). Section 2.08 and Section 2.09 shall determine which Notes are considered to be "outstanding" for the purposes of this Section 9.02.

(b)    Upon the request of the Issuer, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.02 and Section 13.02, the Trustee shall join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture unless such amended and supplemental indenture directly affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such amended or supplemental indenture.

(c)    It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver. It shall be sufficient if such consent approves the substance of such proposed amendment, supplement or waiver.

(d)    After an amendment, supplement or waiver under this Section 9.02

#4834-6333-0618

Case 1:20-cv-02043-LJL Document 1-2 Filed 03/06/20 Page 89 of 114

becomes effective, the Issuer shall give to the Holders a notice briefly describing such amendment, supplement or waiver. However, the failure of the Issuer to give such notice to all the Holders, or any defect in the notice, shall not impair or affect the validity of any such amendment, supplement or waiver.

(e)     [Reserved]

(f)     Without the consent of each affected Holder, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder):

(1)     reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2)     reduce the stated rate of interest or extend the stated time for payment of interest on any Note;

(3)     reduce the principal of or extend the Stated Maturity of any Note;

(4)     waive a Default or Event of Default in the payment of principal of, premium, if any, or interest on the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the then outstanding Notes with respect to a nonpayment default and a waiver of the payment default that resulted from such acceleration);

(5)     reduce the premium payable upon the redemption or repurchase of any Note or change the time at which any Note may be redeemed or repurchased as described in Sections 3.06, 4.15, 6.02(b) or 6.02(c), whether through an amendment or waiver of provisions in the covenants, definitions or otherwise;

(6)     make any Note payable in a currency other than that stated in the Note;

(7)     impair the right of any Holder to receive payment of principal, premium, if any, or interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(8)     make any change in the amendment or waiver provisions which require each Holder's consent;

(9)     modify the Note Guarantees in any manner adverse to the Holders; or

(10)     amend, change or modify the obligation of the Issuer or any Guarantor to pay Additional Amounts.

In addition, without the consent of the Holders of at least 66 2/3% of the principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), no amendment, supplement or waiver may modify any Collateral Document or the provisions in this Indenture dealing with Collateral

#4834-6333-0618

Case 1:20-cv-02043-LJL  Document 1-2  Filed 03/06/20  Page 90 of 114

Documents or application of trust moneys in any manner, taken as a whole, materially adverse to the Holders or otherwise release any Collateral other than in accordance with this Indenture and the Collateral Documents.

(g)    A consent to any amendment, supplement or waiver of this Indenture, the Notes or the Note Guarantee or any other Notes Document by any Holder given in connection with a tender of such Holder's Notes shall not be rendered invalid by such tender.

Section 9.03    Compliance with Trust Indenture Act.

If this Indenture is qualified under the Trust Indenture Act, every amendment or supplement to this Indenture or the Notes shall be set forth in an amended or supplemental indenture that complies with the Trust Indenture Act as then in effect.

Section 9.04    Revocation and Effect of Consents.

(a)    Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the waiver, supplement or amendment becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

(b)    The Issuer may, but shall not be obligated to, fix a record date pursuant to Section 1.05 for the purpose of determining the Holders entitled to consent to any amendment, supplement or waiver.

Section 9.05    Notation on or Exchange of Notes.

(a)    The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Issuer in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

(b)    Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06    Trustee to Sign Amendments, etc.

The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article 9 if the amendment, supplement or waiver does not adversely affect the rights, duties, liabilities or immunities of the Trustee. In executing any amendment, supplement or waiver, the Trustee shall receive and (subject to Section 7.01) shall be fully protected in conclusively relying upon, in addition to the documents required by Section 13.02, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amendment, supplement or waiver is authorized or permitted by this Indenture and that such amendment, supplement or

-73-

Case 1:20-cv-02043-LJL Document 1-2 Filed 03/06/20 Page 91 of 114

waiver is the legal, valid and binding obligation of the Issuer and any Guarantor party thereto, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof (including Section 9.03).

Section 9.07   Payment for Consent.

No Obligor shall, or shall permit any of its Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to all Holders and is paid to all Holders that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or amendment; *provided* that if such consents, waivers or amendments are sought in connection with an exchange offer where participation in such exchange offer is limited to Holders who are QIBs, or non-U.S. Persons, within the meaning given to such term in Regulation S under the Securities Act then such consideration need only be offered to all Holders to whom the exchange offer is made and to be paid to all such Holders that consent, waive or agree to amend in such time frame.

ARTICLE 10

COLLATERAL AND SECURITY

Section 10.01  The Collateral.

(a)      The Issuer hereby appoints the Trustee to act as Collateral Agent, and each Holder by its acceptance of any Notes and the Guarantees thereof, irrevocably consents and agrees to such appointment. The Collateral Agent shall have the privileges, powers and immunities set forth in this Indenture and the Collateral Documents. All of the rights and protections granted to the Trustee pursuant to Article 7 and Section 13.02 of this Indenture are applicable to the Collateral Agent *mutatis mutandis*. The due and punctual payment of the principal of, premium, if any, and interest on the Notes and the Guarantees thereof when and as the same shall be due and payable, whether on an Amortization Payment Date, an Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, interest on the overdue principal of and interest (to the extent permitted by law), if any, on the Notes and the Guarantees thereof and performance of all other Obligations under this Indenture, including, without limitation, the Obligations of the Issuer set forth in Section 7.07 herein, and the Notes and the Guarantees thereof and the Collateral Documents, shall be secured by first-priority Lien and security interests in the Collateral, in each case subject to Permitted Liens, as and to the extent provided in the Collateral Documents which the Issuer and Guarantors have entered into simultaneously with the execution of this Indenture and shall be secured by all Collateral Documents hereafter delivered as required or permitted by this Indenture and the Collateral Documents. The Issuer and the Guarantors hereby agree that the Collateral Agent shall hold the Collateral in trust for the benefit of all of the Holders and the Trustee, in each case pursuant to the terms of the Collateral Documents, and the Collateral Agent and the Trustee are hereby authorized to execute and deliver the Collateral Documents.

#4834-6333-0618

(b)     Each Holder, by its acceptance of any Notes and the Guarantees thereof, irrevocably consents and agrees to the terms of the Collateral Documents (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms, agrees to the appointment of the Collateral Agent and authorizes and directs the Collateral Agent to perform its obligations and exercise its rights, powers and discretions under the Collateral Documents in accordance therewith.

(c)     The Trustee and each Holder, by accepting the Notes and the Guarantees thereof, acknowledges that, as more fully set forth in the Collateral Documents, the Collateral as now or hereafter constituted shall be held for the benefit of all the Holders and the Trustee, and that the Lien of this Indenture and the Collateral Documents in respect of the Trustee and the Holders is subject to and qualified and limited in all respects by the Collateral Documents and actions that may be taken thereunder.

Section 10.02  Further Assurances.

(a)     The Issuer and the Guarantors shall execute any and all further documents, financing statements, agreements and instruments, and take all further actions that may be required under applicable law, or that the Collateral Agent or the Trustee may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests and Liens created or intended to be created by the Collateral Documents in the Collateral.  In addition, to the extent required under this Indenture or any of the Collateral Documents, from time to time, the Issuer and the Guarantors shall reasonably promptly secure the Obligations under this Indenture and Collateral Documents by pledging or creating, or causing to be pledged or created, perfected security interests and Liens with respect to the Collateral to the extent required by the Collateral Documents.  Such security interests and Liens shall be created under the Collateral Documents and other security agreements and other instruments and documents in form and substance reasonably satisfactory to the Collateral Agent.

(b)     Without limiting any rights or powers granted by this Indenture to the Trustee, Paying Agent or Collateral Agent, the Trustee, Paying Agent or Collateral Agent, as applicable, is hereby appointed the attorney in fact of each of the Issuer and the Guarantors for the purpose of carrying out the provisions of this Indenture and taking any action and executing any instruments that the Trustee, Paying Agent or Collateral Agent, as applicable, may deem necessary or advisable to accomplish the purposes, which appointment as attorney in fact is irrevocable and coupled with an interest.  Without limiting the generality of the foregoing, so long as the Trustee, Paying Agent or Collateral Agent, as applicable, shall be entitled under this Indenture or any of the Collateral Documents to make collections in respect of the Collateral, the Trustee, Paying Agent or Collateral Agent, as applicable, shall have the right and power to receive, endorse and collect all checks made payable to the order of any of the Issuer or Guarantors representing any dividend, payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same.

Section 10.03  After-Acquired Property.

#4834-6333-0618

(a)     Upon the acquisition by the Issuer or any of the Guarantors after the Issue Date of any assets, or any equipment or fixtures which constitute accretions, additions or technological upgrades to the equipment or fixtures or any working capital assets that, in any such case, form part of the Collateral, the Issuer or such Guarantor shall execute and deliver:

(1)     with regard to real property, the items described in Section 10.05 within 90 days of the date of acquisition of the applicable asset (but not earlier than 90 days after the Issue Date) and,

(2)     with regard to any other after-acquired property to the extent required by the Collateral Documents, any information, documentation, financing statements or other certificates and opinions of counsel as may be necessary to vest in the Collateral Agent a perfected security interest, subject only to Permitted Liens, in such after-acquired property and to have such after-acquired property added to the Collateral, and thereupon all provisions of the Indenture and the Collateral Documents relating to the Collateral shall be deemed to relate to such after-acquired property to the same extent and with the same force and effect.

(b)     With respect to as-extracted Collateral, if any, on any real property, the Issuer and Guarantors shall be required to make or permit any financing statement required by the Collateral Documents as soon as reasonably practicable, but in any event, within 30 days of date of acquisition of the real property.  Further, the Issuer and Guarantors shall not be obligated to make or permit any financing statement filings at any county, real estate or other local filing office solely with respect to fixtures or as-extracted Collateral, if any, located on Leased Real Property until 30 days after the date the Issuer or Guarantors acquire rights to such Leased Real Property, or in any event if such a filing would be prohibited by, or constitute a breach or default under or result in the termination of or require any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to the Leased Real Property.

Section 10.04  Impairment of Security Interest.

Neither the Issuer nor any of the Subsidiaries or Guarantors shall (i) take or omit to take any action which would materially adversely affect or impair the Liens in favor of the Collateral Agent and the Holders of Notes with respect to the Collateral, (ii) grant any Person, or permit any Person (other than the Collateral Agent), to retain any Liens on the Collateral, other than Permitted Liens or (iii) enter into any agreement that requires the proceeds received from any sale of Collateral to be applied to repay, redeem, defease or otherwise acquire or retire any Indebtedness of any Person in a manner that conflicts with this Indenture, the Notes, the Note Guarantees and the Collateral Documents.  The Issuer and each Guarantor shall, at their sole cost and expense, execute and deliver all such agreements and instruments as necessary, or as the Trustee or the Collateral Agent reasonably requests, to more fully or accurately describe the assets and property intended to be Collateral or the Obligations intended to be secured by the Collateral Documents.

#4834-6333-0618

Section 10.05  Real Estate Mortgages and Filings.

With respect to any fee interest in any Premises owned by an Obligor or any of their Subsidiaries on the Issue Date or acquired by an Obligor or any of their Subsidiaries after the Issue Date that forms a part of the Collateral, within 90 days of the Issue Date or 90 days of the date of acquisition (but not earlier than 90 days from the Issue Date), as applicable:

(a)  each Obligor or any of their Subsidiaries shall deliver to the Collateral Agent, as mortgagee or beneficiary, as applicable, for the ratable benefit of itself and the Holders, fully executed counterparts of Mortgages, in accordance with the requirements of this Indenture and/or the Collateral Documents, duly executed by such Obligor or such Subsidiary, together with satisfactory evidence of the completion (or satisfactory arrangements for the completion) of all recordings and filings of such Mortgage (and payment of any taxes or fees in connection therewith), together with any necessary fixture filings, as may be necessary to create a valid, perfected Lien, with the priority required by the Collateral Documents, subject to Permitted Liens, against the properties purported to be covered thereby;

(b)  the Collateral Agent shall have received mortgagee's title insurance policies in favor of the Collateral Agent, and its successors and/or assigns, in the form necessary, with respect to the surface rights in real property purported to be covered by the applicable Mortgages, to insure that the interests created by the Mortgages constitute valid Liens thereon, with the priority required by the Collateral Documents, free and clear of all Liens, defects and encumbrances, other than Permitted Liens.  All such title policies to be in amounts equal to 100% of the estimated Fair Market Value of the Premises covered thereby and such policies shall also include, to the extent available, all such endorsements as shall be reasonably required in transactions of similar size and purpose and shall be accompanied by evidence of the payment in full by the Issuer or the applicable Guarantor of all premiums thereon (or that satisfactory arrangements for such payment have been made); and

(c)  each applicable Obligor or any of their Subsidiaries shall deliver to the Collateral Agent (x) with respect to each of the Premises owned on the Issue Date, such existing surveys, plats, or maps that are in the possession of any such Obligor or Subsidiary and such local counsel opinions and opinions of counsel in the jurisdiction of organization of the owner of the applicable Premises as are necessary and appropriate and (y) with respect to each of the Premises acquired after the Issue Date, such existing surveys, plats, or maps that are in the possession of such Obligor or such Subsidiary and such local counsel opinions and opinions of counsel in the jurisdiction of organization of the owner of the applicable Premises as the Collateral Agent and its counsel may reasonably request.

Section 10.06  Release of Collateral.

(a)  The Liens on the Collateral shall be released with respect to the Notes and the Note Guarantees, as applicable:

(1)  in whole, upon payment in full of the principal of, accrued and unpaid interest and premium, if any, on the Notes;

(2)  in whole, upon satisfaction and discharge of this Indenture in

-77-

accordance with Article 12 of this Indenture;

(3)     [Reserved];

(4)     in part, as to any property constituting Collateral (A) that is sold, transferred or otherwise disposed of by the Issuer or any of the Guarantors (other than to the Issuer or another Guarantor) in a transaction permitted by the Collateral Documents (to the extent of the interest sold or disposed of); or (B) otherwise in accordance with, and as expressly provided for under, this Indenture or the Collateral Documents;

(5)     in whole as to all Collateral that is owned by a Guarantor that is released from its Note Guarantee in accordance with this Indenture; and

(6)     in whole or in part, with the consent of Holders of $66^{2/3}\%$ in aggregate principal amount of the Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes);

*provided*, that, in the case of any release in whole pursuant to clauses (1) through (3) above, all amounts owing to the Trustee and the Collateral Agent under this Indenture, the Notes, the Note Guarantees and the Collateral Documents have been paid or otherwise provided for to the reasonable satisfaction of the Trustee and Collateral Agent.

(b)     With respect to the release of Collateral, the Issuer shall furnish to the Trustee and Collateral Agent, prior to each proposed release of Collateral pursuant to the Collateral Documents and this Indenture, an Officers' Certificate and an Opinion of Counsel to the effect that all conditions precedent provided for in this Indenture and the Collateral Documents to such release have been complied with; *provided*, *however*, in no event shall an Officers' Certificate be required to release a Lien on Collateral that is sold or pledged in the ordinary course of business to the extent such sale or pledge is permitted by this Indenture.

Upon compliance by the Issuer or the Guarantors, as the case may be, with the conditions precedent set forth above, the Trustee or the Collateral Agent shall promptly cause to be released and reconveyed to the Issuer or the Guarantors, as the case may be, the released Collateral and, if necessary, the Collateral Agent shall, at the Issuer's expense, execute (and the Issuer shall file) such documents or instruments (that are prepared by the Issuer and provided to the Collateral Agent) as shall be necessary to provide for the release by the Collateral Agent of the released Collateral.

Section 10.07  Authorization of Actions to be Taken by the Trustee or the Collateral Agent Under the Collateral Documents.

(a)     Subject to the provisions of the Collateral Documents, each of the Trustee or the Collateral Agent may, in its sole discretion and without the consent of the Holders, on behalf of the Holders, take all actions it deems necessary or appropriate in order to (a) enforce any of its rights or any of the rights of the Holders under the Collateral Documents and (b) collect and receive any and all amounts payable in respect of the Collateral in respect of the Obligations of the Obligors and any of their Subsidiaries hereunder and thereunder.  Subject to the provisions of the Collateral Documents, the Trustee or the Collateral Agent shall have the

-78-

power to institute and to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Collateral Documents or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interest and the interests of the Holders in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders or the Trustee).

(b)     The Trustee or the Collateral Agent shall not be responsible for the perfection or priority of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Trustee or the Collateral Agent, for the validity, sufficiency, existence, genuineness or value of the Collateral or the validity or enforceability of the Liens in any of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Issuer or the Guarantors to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Trustee or the Collateral Agent shall have no responsibility for recording, filing, re-recording or re-filing any financing statement, continuation statement, document, instrument or other notice in any public office at any time or times or to otherwise take any action to perfect or maintain the perfection of any security interest granted to it under the Collateral Documents or otherwise.

(c)     Where any provision of this Indenture requires that additional property or assets be added to the Collateral, the Issuer shall deliver to the Trustee or the Collateral Agent the following:

(1)     the form of instrument adding such Collateral, which, based on the type and location of the property subject thereto, shall be in substantially the form of the applicable Collateral Documents entered into on or about the date of this Indenture, with such changes thereto as the Issuer shall consider appropriate, or in such other form as the Issuer shall deem proper; provided that any such changes or such form are administratively satisfactory to the Trustee or the Collateral Agent; and

(2)     such financing statements, if any, as the Issuer shall deem necessary to perfect the Collateral Agent's security interest in such Collateral.

Section 10.08  Collateral Account.

(a)     The Collateral Agent is authorized to receive any funds for the benefit of the Holders distributed under, and in accordance with, the Collateral Documents, and to make further distributions of such funds to the Holders according to the provisions of this Indenture and the Collateral Documents.

(b)     All cash and Cash Equivalents received by the Collateral Agent from

#4834-6333-0618

Case 1:20-cv-02043-LJL   Document 1-2   Filed 03/06/20   Page 97 of 114

Recovery Events, Net Award or Net Insurance Proceeds, foreclosures of or sales of the Collateral, and other awards or proceeds pursuant to the Collateral Documents, including earnings, revenues, rents, issues, profits and income from the Collateral received pursuant to the Collateral Documents, shall be deposited in the Collateral Account and thereafter shall be held, applied and/or disbursed by the Collateral Agent in accordance with the terms of this Indenture (including, without limitation, Section 6.13 and Section 10.08(a)). The Collateral Account shall be a trust account and shall be established and maintained by the Collateral Agent at one of its corporate trust offices (which may include the New York corporate trust office), and all Collateral shall be credited thereto.

(c)     Pending the distribution of funds in the Collateral Account in accordance with the provisions hereof and provided that no Event of Default shall have occurred and be continuing, the Issuer may direct the Collateral Agent in writing to invest such funds in Cash Equivalents specified in such direction, such investments to mature by the times such funds are needed hereunder and such direction to certify that such funds constitute Cash Equivalents and that no Event of Default shall have occurred and be continuing. So long as no Event of Default shall have occurred and be continuing, the Issuer may direct the Collateral Agent to sell, liquidate or cause the redemption of any such investments, such direction to certify that no Event of Default shall have occurred and be continuing. Any gain or income on any investment of funds in the Collateral Account shall be credited to the Collateral Account. The Collateral Agent shall have no liability for any loss, fee, tax or other charge incurred in connection with any investment or any sale, reinvestment, liquidation or redemption thereof made in accordance with the provisions of this Section 10.08(c).

Section 10.09  Information Regarding Collateral.

(a)     The Issuer shall furnish to the Collateral Agent, with respect to the Issuer or any Guarantor, promptly (and in any event within 30 days of such change) written notice of any change in such Person's (1) legal name, (2) jurisdiction of organization or formation, (3) identity or corporate structure or (4) organizational identification number. The Issuer and the Guarantors shall agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code and any other applicable laws that are required in this Indenture and/or the Collateral Documents in order for the Collateral to be made subject to the Lien of the Collateral Agent under this Indenture and/or the Collateral Documents in the manner and to the extent required by this Indenture or any of the Collateral Documents and shall take all necessary action so that such Lien is perfected with the same priority as immediately prior to such change to the extent required by the Indenture and/or the Collateral Documents. The Issuer also agree promptly to notify the Collateral Agent in writing if any material portion of the Collateral is damaged, destroyed or condemned.

(b)     Each year, within 150 days after the end of the preceding fiscal year, the Issuer shall deliver to each of the Trustee and the Collateral Agent an Officers' Certificate setting forth the information required pursuant to the schedules required by the Collateral Documents or confirming that there has been no change in such information since the date of the prior annual certification.

Section 10.10  Maintenance of Collateral.

#4834-6333-0618

Each Obligor shall maintain the Collateral in good, safe and insurable operating order, condition and repair (ordinary wear and tear excepted, and only to the extent such Collateral is in operating order as of the date of the original issuance of the Notes hereunder, or the relevant Obligor brings non-operating Collateral into operation after the date of the original issuance of the Notes hereunder) and do all other acts as may be reasonably necessary or appropriate to maintain and preserve the Collateral; *provided*, that the foregoing requirement shall not prevent any Obligor or any of their Subsidiaries from discontinuing the use, operation or maintenance of Collateral or disposing of Collateral, if such discontinuance or disposal (x) is, in the judgment of the Issuer, desirable in the conduct of the business of the Obligors taken as a whole and (y) is otherwise in compliance with the provisions of this Indenture and the Collateral Documents. The Obligors shall pay all real estate and other taxes, and maintain in full force and effect all material permits and insurance in amounts that insure against such losses and risks as are reasonable for the type and size of the business conducted by the Obligors.

Section 10.11  Negative Pledge

(a)     None of the Obligors, any Person that is a parent of an Obligor, or any of their respective Subsidiaries shall pledge its Equity Interests as security or otherwise.

(b)     No Obligor shall, and each Obligor shall not permit any of its Subsidiaries to, further pledge the Collateral as security or otherwise, subject to Permitted Liens.

ARTICLE 11

GUARANTEES

Section 11.01  Guarantee.

(a)     Subject to this Article 11, each of the Guarantors party hereto jointly and severally irrevocably and unconditionally guarantees, on a senior secured basis, to each Holder and to the Trustee and its successors and assigns, in its capacity as Trustee and in each other capacity in which the Trustee serves as an Agent, irrespective of the validity and enforceability of this Indenture, the Notes or the Obligations of the Issuer hereunder or under any other Notes Document, that:  (1) the principal, premium and Additional Amounts, if any, and interest on the Notes shall be promptly paid in full when due, whether at Stated Maturity, by acceleration, redemption or otherwise, and interest on the overdue principal and interest on the Notes, if any, if lawful, and all other Obligations of the Issuer to the Holders or the Trustee hereunder or under the Notes Documents shall be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and (2) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at Stated Maturity, by acceleration or otherwise collectively, the "Guaranteed Obligations".  Failing payment by the Issuer when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors shall be jointly and severally obligated to pay.  Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

-81-

#4834-6333-0618

(b) The Guarantors hereby agree that their Obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture or any other Notes Document, the absence of any action to enforce the same, any waiver or consent by any Holder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, protest, notice and all demands whatsoever and covenants that this Note Guarantee shall not be discharged except by complete performance of the Obligations contained in the Notes, this Indenture and each other Notes Document, or pursuant to Section 11.06.

(c) Each of the Guarantors jointly and severally also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Trustee, any Agent or any Holder in enforcing any rights under this Section 11.01.

(d) If any Holder, any Agent or the Trustee is required by any court or otherwise to return to the Issuer, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to the Issuer or the Guarantors, any amount paid either to the Trustee, such Agent or such Holder, this Note Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

(e) Each Guarantor agrees that it shall not be entitled to enforce any right of subrogation in relation to the Holders in respect of any Obligations guaranteed hereby until payment in full of all Obligations guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders, each Agent and the Trustee, on the other hand, (1) the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article 6 for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such Obligations as provided in Article 6, such Obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee. The Guarantors shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Note Guarantees.

(f) Each Note Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Issuer for liquidation or reorganization, should the Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Issuer's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Notes are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee on the Notes or the Note Guarantees, whether as a "voidable preference," "fraudulent transfer" or otherwise, all as though such payment or performance had not been made. In the event that any payment or any part thereof, is rescinded, reduced, restored or returned, the Notes shall, to the fullest extent permitted by law, be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

-82-

#4834-6333-0618

Case 1:20-cv-02043-LJL Document 1-2 Filed 03/06/20 Page 100 of 114

(g)    In case any provision of any Note Guarantee shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(h)    Each payment to be made by a Guarantor in respect of its Note Guarantee shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

Section 11.02  Limitation on Guarantor Liability.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guarantee of such Guarantor not constitute a fraudulent conveyance or a fraudulent transfer for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Note Guarantee.  To effectuate the foregoing intention, the Trustee, each Agent, the Holders and the Guarantors hereby irrevocably agree that the Obligations of each Guarantor shall be limited to the maximum amount as will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the Obligations of such other Guarantor under this Article 11, result in the Obligations of such Guarantor under its Note Guarantee not constituting a fraudulent conveyance or fraudulent transfer under applicable law.  Each Guarantor that makes a payment under its Note Guarantee shall be entitled upon payment in full of all Guaranteed Obligations under this Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment, determined in accordance with GAAP.

Section 11.03  Execution and Delivery.

(a)    To evidence its Note Guarantee set forth in Section 11.01, each Guarantor hereby agrees that this Indenture shall be executed on behalf of such Guarantor by an Officer or person holding an equivalent title.

(b)    Each Guarantor hereby agrees that its Note Guarantee set forth in Section 11.01 shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Note Guarantee on the Notes.

(c)    If an Officer whose signature is on this Indenture no longer holds that office at the time the Trustee authenticates the Note, the Note Guarantees shall be valid nevertheless.

(d)    The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

(e)    If required by Section 4.11, any applicable Obligor shall cause any newly created or acquired Subsidiary to comply with the provisions of Section 4.11 and this Article 11, to the extent applicable.

#4834-6333-0618

Section 11.04  Subrogation.

Each Guarantor shall be subrogated to all rights of Holders against the Issuer in respect of any amounts paid by any Guarantor pursuant to the provisions of Section 11.01; *provided* that, if an Event of Default has occurred and is continuing, no Guarantor shall be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by the Issuer under this Indenture or the Notes shall have been paid in full.

Section 11.05  Benefits Acknowledged.

Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the guarantee and waivers made by it pursuant to its Note Guarantee are knowingly made in contemplation of such benefits.

Section 11.06  Release of Note Guarantees.

(a)     A Note Guarantee by a Guarantor shall be automatically and unconditionally released and discharged, and no further action by such Guarantor, the Issuer or the Trustee shall be required for the release of such Guarantor's Note Guarantee, upon:

(1)     (A) in the case of a Guarantor, any sale, assignment, transfer, conveyance, exchange or other disposition (by merger, consolidation or otherwise) of the Capital Stock of such Guarantor after which the applicable Guarantor is no longer a Subsidiary, which sale, assignment, transfer, conveyance, exchange or other disposition is made in compliance with the provisions of this Indenture and Section 5.01; *provided* that (i) all the Note Guarantees and other obligations of such Guarantor in respect of all other Indebtedness of the Issuer and its Subsidiaries terminate upon consummation of such transaction and (ii) any Investment of the Issuer or any other Subsidiary of the Issuer (other than any Subsidiary of such Guarantor) in such Guarantor or any Subsidiary of such Guarantor in the form of an Obligation or Preferred Stock is repaid, satisfied, released and discharged in full upon such release; or

(B)     [Reserved];

(C)     the discharge of the Issuer's Obligations in accordance with Article 12 of this Indenture; and

(2)     such Guarantor delivering to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in this Indenture relating to such transaction or release have been complied with.

(b)     At the written request of the Issuer, the Trustee shall execute and deliver any documents reasonably required in order to evidence such release, discharge and termination in respect of the applicable Note Guarantee.

#4834-6333-0618

## ARTICLE 12

### SATISFACTION AND DISCHARGE

Section 12.01  Satisfaction and Discharge.

    (a)    This Indenture shall be discharged, and shall cease to be of further effect as to all Notes, when either:

    (1)    all Notes that have been authenticated and delivered (except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust) have been delivered to the Trustee for cancellation; or

    (2)    (A) all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the giving of a notice of redemption or otherwise, shall become due and payable within one year or are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer or any Guarantor have irrevocably deposited or caused to be deposited with the Trustee, as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as shall be sufficient, as confirmed, certified or attested to by an Independent Financial Advisor in writing to the Trustee, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption, as the case may be;

    (B)    no Default or Event of Default has occurred and is continuing on the date of such deposit or will occur as a result of such deposit (other than a Default or an Event of Default resulting from the borrowing of funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) and the deposit will not result in a breach or violation of, or constitute a default under, any other material agreement or material instrument (other than this Indenture) to which the Issuer or any Guarantor are a party or by which the Issuer or any Guarantor are bound;

    (C)    the Issuer or any Guarantor has paid or caused to be paid all sums payable by the Issuer under this Indenture; and

    (D)    the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

    (b)    In addition, the Issuer shall, upon its request for acknowledgement of satisfaction and discharge, deliver to the Trustee an Officers' Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent to satisfaction and discharge have been satisfied. Notwithstanding the satisfaction and discharge of this Indenture, if money shall have been

-85-

#4834-6333-0618

Case 1:20-cv-02043-LJL Document 1-2 Filed 03/06/20 Page 103 of 114

deposited with the Trustee pursuant to subclause (A) of clause (2) of Section 12.01(a), the provisions of Section 12.02 shall survive.

Section 12.02  Application of Trust Money.

        (a)     All money deposited with the Trustee pursuant to Section 12.01 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal, premium, if any, and interest for whose payment such money has been deposited with the Trustee, but such money need not be segregated from other funds except to the extent required by law.

        (b)     If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 12.01 by reason of any legal proceeding or by reason of any order or judgment of any court or Governmental Authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and any Guarantor's Obligations under this Indenture, the Notes and the Note Guarantees shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.01; *provided* that if the Issuer has made any payment of principal, premium, if any, or interest on any Notes because of the reinstatement of its Obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent, as the case may be.

ARTICLE 13

MISCELLANEOUS

Section 13.01  Notices.

        (a)     Any notice or communication to the Issuer, any Guarantor or the Trustee is duly given if in writing and (1) delivered in person, (2) mailed by first-class mail (certified or registered, return receipt requested), postage prepaid, or overnight air courier guaranteeing next day delivery or (3) sent by facsimile or electronic transmission (PDF only), to its address:

        if to the Issuer or any Guarantor:

        c/o ERP Compliant Fuels, LLC
        15 Appledore Lane
        Natural Bridge, Virginia 24578
        Attention: Tom Clarke
        Email:  Tom.Clarke@kissito.org

        with a copy to:

        Dentons US LLP
        1221 Avenue of the Americas
        New York, New York 10022

#4834-6333-0618

Attention: Oscar Pinkas
oscar.pinkas@dentons.com

if to the Trustee, Collateral Agent, Paying Agent, Registrar or Calculation Agent:

Wilmington Savings Fund Society, FSB, as Trustee
500 Delaware Avenue, 11th Floor
Wilmington, Delaware 19801
Attention: Geoffrey Lewis
Fax No.: (302) 421-9137
Email: glewis@wsfsbank.com

The Issuer, any Guarantor or the Trustee, by like notice, may designate additional or different addresses for subsequent notices or communications.

(b)     All notices and communications (other than those sent to Holders) shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; on the first date of which publication is made, if by publication; five calendar days after being deposited in the mail, postage prepaid, if mailed by first-class mail; the next Business Day after timely delivery to the courier, if mailed by overnight air courier guaranteeing next day delivery; when receipt acknowledged, if sent by facsimile or electronic transmission; *provided* that any notice or communication delivered to the Trustee shall be deemed effective upon actual receipt thereof.

(c)     Any notice or communication to a Holder shall be mailed by first-class mail (certified or registered, return receipt requested) or by overnight air courier guaranteeing next day delivery to its address shown on the Note Register or by such other delivery system as the Trustee agrees to accept.  Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

(d)     Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

(e)     Notwithstanding any other provision herein, where this Indenture provides for notice of any event to any Holder of an interest in a Global Note (whether by mail or otherwise), such notice shall be sufficiently given if given to the Depositary for such Note (or its designee), according to the applicable procedures of such Depositary, if any, prescribed for the giving of such notice.

(f)     The Trustee agrees to accept and act upon notice, instructions or directions pursuant to this Indenture sent by unsecured facsimile or electronic transmission; *provided*, *however*, that (1) the party providing such written notice, instructions or directions, subsequent to such transmission of written instructions, shall provide the originally executed instructions or directions to the Trustee in a timely manner, and (2) such originally executed notice, instructions or directions shall be signed by an authorized representative of the party providing such notice, instructions or directions.  The Trustee shall not be liable for any losses, costs or expenses arising

-87-

directly or indirectly from the Trustee's reasonable reliance upon and compliance with such notice, instructions or directions notwithstanding such notice, instructions or directions conflict or are inconsistent with a subsequent notice, instructions or directions.

(g)     If a notice or communication is sent in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

(h)     If the Issuer mails a notice or communication to Holders, it shall mail a copy to the Trustee and each Agent at the same time.

Section 13.02  Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Issuer or any Guarantor to the Trustee to take any action under this Indenture, including any action as an Agent, the Issuer or such Guarantor, as the case may be, shall furnish to the Trustee, at the Trustee's request, either or both of:

(1)     an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.03) stating that, in the opinion of the signer(s), all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(2)     an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.03) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been complied with.

Section 13.03  Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(1)     a statement that the Person making such certificate or opinion has read such covenant or condition;

(2)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)     a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with (and, in the case of an Opinion of Counsel, may be limited to reliance on an Officers' Certificate as to matters of fact); and

(4)     a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

FILED: NEW YORK COUNTY CLERK 02/06/2020 04:16 PM INDEX NO. 650854/2020
NYSCEF DOC. NO. 4                                                    RECEIVED NYSCEF: 02/06/2020

Section 13.04  Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 13.05  No Personal Liability of Directors, Officers, Employees, Members, Partners and Stockholders.

No past, present or future director, officer, employee, incorporator, member, partner or stockholder of the Issuer or any Guarantor, as such, shall have any liability for any Obligations of the Issuer or any Guarantor (other than the Issuer in respect of the Notes and each Guarantor in respect of its Note Guarantee) under the Notes, the Note Guarantees or this Indenture or for any claim based on, in respect of, or by reason of, such Obligations or their creation.

Each Holder by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

Section 13.06  Governing Law.

THIS INDENTURE, THE NOTES AND ANY NOTE GUARANTEE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 13.07  Waiver of Jury Trial.

THE ISSUER AND EACH OF THE GUARANTORS, THE COLLATERAL AGENT AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTEES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.08  Force Majeure.

In no event shall the Trustee or any Agent be responsible or liable for any failure or delay in the performance of its Obligations under this Indenture arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services; it being understood that the Trustee and each Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 13.09  No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt

#4834-6333-0618

agreement of the Issuer or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 13.10  Successors.

All agreements of the Issuer in this Indenture and the Notes shall bind its successors. All agreements of the Trustee in this Indenture shall bind its successors. All agreements of each Guarantor in this Indenture shall bind its successors, except as otherwise provided in Section 11.06.

Section 13.11  Severability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.12  Counterpart Originals.

The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

Section 13.13  Table of Contents, Headings, etc.

The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

Section 13.14  Facsimile and PDF Delivery of Signature Pages.

The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

Section 13.15  U.S.A. PATRIOT Act.

The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustee is required to obtain, verify, and record information that identifies each Person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they shall provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the U.S.A. PATRIOT Act.

Section 13.16  Payments Due on Non-Business Days.

In any case where any Payment Date, redemption date or repurchase date or the Stated Maturity of the Notes shall not be a Business Day, then (notwithstanding any other provision of this Indenture or of the Notes) payment of principal, premium, if any, or interest on

-90-

#4834-6333-0618

Case 1:20-cv-02043-LJL Document 1-2 Filed 03/06/20 Page 108 of 114

the Notes need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the applicable Payment Date, redemption date or repurchase date, or at the Stated Maturity of the Notes, *provided* that no interest will accrue for the period from and after such Payment Date, redemption date, repurchase date or Stated Maturity, as the case may be.

Section 13.17  Effectiveness of Indenture

No party shall have any rights, obligations or other benefits or responsibilities hereunder unless and until such time as the parties have issued the Notes hereunder in connection with the Closing (as defined in the APA), and the Closing has occurred; *provided* that the Trustee shall be entitled to an Officers' Certificate and Opinion of Counsel that such closing has occurred and that all conditions precedent have been satisfied.

Section 13.18  Trustee as Agent

Each Holder of a Note, by accepting a Note, hereby appoints the Trustee, on its behalf and on behalf of each future Holder of such Note, as its contractual representative under the Subordination Agreement and hereby authorizes the Trustee to execute and deliver to Senior Creditor (as defined in the Subordination Agreement) and the Borrower the Subordination Agreement, and any and all agreements, certificates, documents or instruments as shall be necessary or appropriate to effect the purposes of the Subordination Agreement, on its behalf and on behalf of each future Holder of such Note, and to act as the contractual representative of such Holder and each such future Holder for all purposes of the Subordination Agreement. Notwithstanding the foregoing, nothing in this Section 13.18 shall create any additional duty or obligation on the Trustee not otherwise contemplated by the terms of this Indenture,  and the Trustee shall have no obligation or liability to any Holder by virtue of this Section 13.18 or for any action taken, or for failing to take any action, as agent or contractual representative of the Holders under the Subordination Agreement.

*[Signatures on following page]*

#4834-6333-0618

ERP IRON ORE, LLC

By

    By:    _____

              Name:
              Title:

ERP COMPLIANT COKE, LLC

By

    By:    _____

              Name:
              Title:

ACKNOWLEDGED AND AGREED
WITH RESPECT TO SECTION___ HEREOF:

THOMAS MATTHEW CLARKE, as a Guarantor

    By

By:    _____
Name: Thomas Matthew Clarke

ANA MERCEDES CLARKE, as a Guarantor

By

By:    _____
Name: Ana Mercedes Clarke

*[Signature page to Indenture]*

#4834-6333-0618

ERP IRON ORE, LLC

By: _____
Name: Thomas M. Clarke
Title: Chief Executive Officer

ERP COMPLIANT COKE, LLC

By: _____
Name: Thomas M. Clarke
Title: Managing Member

THOMAS MATTHEW CLARKE, as a Guarantor

By: _____
Name: Thomas Matthew Clarke

ANA MERCEDES CLARKE, as a Guarantor

By: _____
Name: Ana Mercedes Clarke

[*Signature page to Indenture*]

WILMINGTON SAVINGS FUND SOCIETY, FSB
as Trustee

By:
Name:
Title:    Geoffrey J. Lewis
          Vice President

*[Signature page to Indenture]*

SCHEDULE A

EXISTING INDEBTEDNESS

None.

#4834-6333-0618

SCHEDULE 6.02

MECHANICS LIENHOLDERS

**Indiana Pellet Plant**

Twin City Fan Companies, Ltd.
Solid Platforms, Inc.
Solid Platforms, Inc.
Northern Industrial Erectors, Inc.
Hammerlund's Champion Steel, Inc. d/b/a Champion Steel
Fastenal Company
Accu-Dig, Inc.
Xtreme Contractors Co., LLC
Midwest Constructors, LLC
Wesco Distribution, Inc.
One Source Equipment Rentals, LLC
Central Rent-A-Crane
Ferguson Enterprises, Inc.
Kelly Construction of Indiana, Inc.
Shambaugh & Son L.P.

**Plant 4**

A.W. Kuettel
Ferguson Enterprises, Inc.
Hammerlund's Champion Steel, Inc., d/b/a Champion Steel
Hammerlund Construction
Hunt Electric Corporation
Ironman Concrete Pumping, Inc.
Jamar Company
JK Mechanical Contractors, Inc.
John J. Morgan Company
K Building Components, Inc.
LeJeune Steel Company
Minnesota Industries, Inc.
Noramco Engineering Corporation
Northern Industrial Erectors
Parsons Electric LLC
Range Electric Inc.
Rapids Process Equipment, Inc.
Scheck Industrial Corp.
Toltz, King Duvall Anderson and Associates, Inc. d/b/a TKDA
Trane US Inc.
United Rentals (North America)
Viking Electric Supply
Wesco Distribution

#4834-6333-0618

**Plant 2**

Ferguson Enterprises, Inc.
General Waste Disposal and Recovery Services, Inc.

Hammerlund's Champion Steel, Inc. d/b/a Champion Steel
Hammerlund Construction
Jamar Company
Minnesota Industries, Inc.
Rapids Process Equipment, Inc.
Ulland Brothers, Inc.
Viking Electric Supply Inc.
Wesco Distribution, Inc.

**Plant 1**

Brock White Company, LLC
Ferguson Enterprises, Inc.
General Waste Disposal and Recovery Services, Inc.
Hammerlund's Champion Steel, Inc. d/b/a Champion Steel

**Jessie Loadout**

Noramco Engineering
Toltz, King, Duval, Anderson & Associates, Inc.
Ulland Brothers, Inc.

Hammerlund's Champion Steel, Inc. d/b/a Champion Steel

Hammerlund Construction
Precision Testing, Inc.

#4834-6333-0618